2003 WY 155

**In the Interest of the "H" CHILDREN, Minors.**

**DH, Appellant (Respondent),**

v.

**Wyoming Department of Family Services, Appellee (Petitioner).**

**No. C–02–7.**

Supreme Court of Wyoming.

Nov. 25, 2003.

Rehearing Denied Jan. 13, 2004.

998

Representing Appellant: Sue Davidson of Aspen Ridge Law Offices, P.C., Cheyenne, Wyoming.

Representing Appellee: Hoke MacMillan, Attorney General; Michael L. Hubbard, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General; and Sue Chatfield, Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] This is an appeal from a juvenile court adjudication of neglect and a subsequent placement order. Finding no error, we affirm.

## ISSUES

[¶ 2] On July 11, 2002, the appellant filed a Notice of Appeal in which she stated that the appeal was being taken from Findings of Fact and Conclusions of Law dated June 11, 2002, and an Order for Transfer of Physical Placement Upon Motion Hearing dated July 3, 2002. In her appellate brief, the appellant identified several specific issues, which we restate as follows:

1. Must the Department of Family Services (DFS) follow state statutes, court orders, and its own regulations in a child protection case?

2. Did the juvenile court abuse its discretion by appointing the attorney for one or more of the children to act as guardian ad litem (GAL) for the children?

3. Was the appellant denied procedural due process in the juvenile court proceedings in any of the following particulars?

   a. Meaningful notice and an opportunity to be heard.

   b. Failure to meet the requirements of W.R.C.P. 58.

   c. Arbitrary denial of motions for continuance.

4. Did the juvenile court err in finding neglect under Wyo. Stat. Ann. § 14–3–402(a)(xii)(A) (LexisNexis 2003)?

[¶ 3] The fourth section of the appellant's brief contains some argument pertaining to issue number four above, but the bulk of the argument in that section is directed to a separate issue, which we will identify as follows:

5. Did the juvenile court err in allowing the children to have visitation with their grandparents and aunt?

[¶ 4] In its appellate brief, DFS identifies only two issues:

1. There was sufficient evidence for the juvenile court to determine by a preponderance of the evidence that the appellant neglected her children.

2. The juvenile court's Order for Transfer of Physical Placement Upon Motion Hearing is not an appealable order.

[¶ 5] Throughout this opinion, we will repeatedly note the appellant's failure to support her contentions with cogent argument or citation to pertinent authority. We also need to note at the outset that both of the State's identified issues have to do with the appellant's issues number four and five, and that the State's appellate brief is completely devoid of any response to any of the appellant's other issues. The briefing deficiencies in this case have made it almost impossible to reach the merits of the controversy.

## FACTS

[¶ 6] The appellant has three minor children (DDH, BKH and BMH). At the time of the incidents underlying this case, DDH was thirteen years old, BKH was ten years old, and BMH was eight years old. The appellant and her children lived with the appellant's boyfriend. Frequently, the children spent weekends with the appellant's mother and adoptive father (grandparents).

[¶ 7] On December 1, 2001, the children spent the night with their grandparents. DDH's friend, TS, also spent the night. The appellant had instructed DDH to contact her

by noon the next day to go on a family outing. DDH telephoned home at noon and again between 1:30 and 2:00 p.m., but there was no answer either time. DDH then called the VFW bar, where the appellant and her boyfriend went nearly every night.[1]

[¶ 8] DDH reached the appellant at the VFW. The appellant's speech was slurred and she was angry with DDH for not calling her earlier. After the call, the grandparents went to take the children and TS home. At TS's home, DDH went inside with her friend, whereupon DDH became hysterical. TS's mother asked the grandfather to come inside. DDH then described problems arising in her home, including the appellant's drinking, DDH's suicide threats, the appellant's various boyfriends, the present boyfriend's name-calling and threats of violence, arguing and fighting, and DDH having to raise her siblings. DDH told her grandfather that she did not want to go home, that her mother was drunk, that her mother drinks every night, that she was "tired of it," and that there would be an argument about it if she went home.

[¶ 9] At about that time, the appellant called TS's residence and spoke with her father. Her father sensed that the appellant was drunk because she was slurring her words. The appellant's boyfriend came on the telephone and threatened the appellant's father with physical violence. TS's mother then called the Sheriff's Department. She and the appellant's father spoke with the sheriff and with the psychiatrist who had dealt with DDH after her recent suicide threat. The appellant's father was advised to take the children to the police department, which he did. At the police department, an officer separately interviewed the appellant's father and all three children. Each child told him about the appellant's drinking and problems that drinking created at home. The officer also spoke with the appellant when she repeatedly called during the interviews. Based upon all he had learned, the officer placed the children in protective custody.

[¶ 10] After the children were taken to the police department, two officers went to the appellant's home. They found both the

appellant and her boyfriend to be agitated, excited, loud, and interruptive, and they described both the appellant and her boyfriend as having slurred speech and a short attention span, and smelling of alcohol. Both officers testified that they believed the appellant and her boyfriend to be intoxicated.

## COURSE OF PROCEEDINGS

[¶ 11] On December 4, 2001, a Laramie County Assistant District Attorney filed a petition in the juvenile court alleging that the three children were neglected under Wyo. Stat. Ann. § 14-3-402(a)(xii)(A) because their "custodian has failed or refused to provide adequate care, maintenance, supervision, education, medical, surgical or any other care necessary for the children's well being." The detailed factual basis for that allegation read as follows:

On December 2, 2001, Officers were called to [address] for a possible suicidal subject. Upon arrival, officers made contact with [the appellant] who immediately denied any suicidal ideation and seemed confused, insisting there had been miscommunication between her and the dispatcher. Also present was [the appellant's] boyfriend[.] Both [the appellant] and [her boyfriend] smelled heavily of al[c]oholic beverages and were uncooperative and agitated during questioning. Essentially, [the appellant] tried to tell Officer Dafoe that her father ... was refusing to return her children to her. [The appellant's father] was contacted and agreed that he had refused to allow [the appellant] to take her children because she was drunk and hostile. [The appellant's father] reported that [the appellant's boyfriend] was also drunk and threatened bodily harm to [him].

The children, [DDH, BKH, and BMH] were interviewed individually. Each reported that their mother has a severe alcohol and drug problem and that they were scared to go home with her. In addition, [DDH] told [her grandfather] that she would kill herself if she had to return to her mother's home, and had just been seen at the emergency room over Thanksgiving,

---

1. DDH testified that she had memorized that   number from calling it so frequently.

having attempted suicide. [DDH] confirmed to [the officers] these suicidal threats and feelings and stated that she is extremely despondent about the situation and fearful of her mother's actions.

[¶ 12] On the same day that the petition was filed, the juvenile court held an informal shelter care hearing pursuant to Wyo. Stat. Ann. § 14-3-409(a) (LexisNexis 2003). After determining that further shelter care was required, the juvenile court temporarily placed the children in the custody of DFS for foster care placement, and ordered DFS to prepare a social summary and convene a multi-disciplinary team meeting.

[¶ 13] The initial hearing on the petition was held on January 3, 2002. Appearing with counsel, the appellant denied the allegations of the petition. Also at the initial hearing, the juvenile court granted the motion of the children's GAL that the children be allowed to have visitation with their grandparents and with an aunt, CW. The juvenile court also continued the children's temporary placement with DFS.

[¶ 14] On January 15, 2002, the appellant filed a Motion to Return Children to Mother's Physical Custody or, Alternatively, Move the Children to Another Foster Care Home; and Motion to Reconsider Visitation Order. The allegations of this motion were of three general types: (1) allegations of deficient care and supervision in the foster home; (2) allegations that the grandparents and CW continued to undermine the appellant's relationship with her children by intrusive and oppressive misconduct; and (3) allegations of procedural irregularities, including lack of notice to the appellant that the visitation issue would arise at the initial hearing, and the failure of counsel for the State to present the proposed Order for Shelter Care to the appellant's counsel for approval as to form as required by W.R.C.P. 58.

[¶ 15] The appellant's motion was heard on February 21, 2002, and was denied by an order entered on March 6, 2002. The order also maintained DFS's temporary legal custody of the children, ordered certain monies be paid over to DFS for support of the children, and ordered that an order be submitted appointing the children's GAL.[2]

[¶ 16] On April 5, 2002, the GAL filed a motion requesting that DDH, over her mother's objections, be allowed to participate in certain school sporting activities. An order entered April 9, 2002, set the matter for hearing two days later. On April 10, 2002, the appellant filed a motion to continue the hearing on the ground that neither she nor her counsel would be available. The motion for continuance was denied and the hearing was held as scheduled, with substitute counsel appearing for the appellant, and with neither the appellant nor her regular counsel being present. The motion was granted.

[¶ 17] The non-jury adjudicatory hearing on the petition was held on May 9 and 16, 2002. Subsequently, the appellant, the State, and the GAL each filed proposed findings of fact and conclusions of law and written closing arguments. On June 11, 2002, the juvenile court entered its Findings of Fact and Conclusions of Law. Succinctly stated, the juvenile court concluded therein that the appellant had neglected her children as alleged in the petition. The children were ordered to remain in the custody of DFS, and DFS was ordered to prepare a case plan with family reunification as the goal. In a decision letter explaining why it had "adopted substantially the state's proposed findings and conclusions," the juvenile court focused on the particular incident of December 2, 2001, but examined that incident in the context of the appellant's relationships with male partners whom she brought into the home, and her "alcohol-centered lifestyle. . . ."

[¶ 18] On June 4, 2002, the GAL filed a motion on behalf of the children seeking a change from their present foster home placement to the home of their aunt, CW. The motion alleged that: (1) the current foster parents were going on vacation; (2) CW and her husband were certified foster parents through DFS; (3) the children al-

---

**2.** Although the GAL began representing the children as early as the initial hearing on January 3, 2002, no order of appointment had been entered at that time. This deficiency was pointed out to the juvenile court at the motion hearing on February 21, 2002, and was remedied by an order entered February 28, 2002.

ready had a long-standing relationship with CW and her family; and (4) the children preferred placement with CW's family rather than placement in some unknown foster home or respite placement. The appellant filed an objection to the GAL's motion in which she alleged primarily that she had been informed by DFS that the current foster parents had canceled their vacation plans.

[¶ 19] The matter was heard on June 13, 2002. After considerable testimony was presented, the GAL and the State argued the benefits of such a family placement, while the appellant argued that, especially given the apparently canceled vacation plans, the children should not be moved into the home of her sister, given the disruptive family dynamics. The juvenile court granted the motion by an order entered July 3, 2002.

[¶ 20] The appellant filed her Notice of Appeal on July 11, 2002, specifically referencing the Findings of Fact and Conclusions of Law entered on June 11, 2002, and the Order for Transfer of Physical Placement Upon Motion Hearing entered July 3, 2002.

## DISCUSSION

### MUST THE DEPARTMENT OF FAMILY SERVICES (DFS) FOLLOW STATE STATUTES, COURT ORDERS, AND ITS OWN REGULATIONS IN A CHILD PROTECTION CASE?

[¶ 21] In her appellate brief, the appellant details three primary areas in which she alleges that DFS has violated state statutes, administrative agency rules, and court orders—making assessments, preparing a social summary, and convening a meeting of the multi-disciplinary team (MDT). In addition, she contends that DFS did not appropriately initiate an investigation of the alleged neglect, as required by Wyo. Stat. Ann. § 14-3-204(a)(iii) (LexisNexis 2003), that it

has never made formal reports to the juvenile court, as required by a court order, and that no written case plan has ever been completed, as required by Chapter 2, Section 7 of DFS's Rules and Regulations Governing Child Protective Services (the DFS Rules).

[¶ 22] Although the appellant's appellate argument on these issues is, in large part, a generalized diatribe against DFS and the particular juvenile court involved in this case,[3] we can glean the following allegations of specific failures by DFS, the State, or the juvenile court:

1. Wyo. Stat. Ann. § 14-3-427(a) (LexisNexis 2003) requires the juvenile court, after a neglect petition is filed, to order DFS to make a pre-disposition study and report. The juvenile court entered such an order on December 5, 2001. At the hearing on February 21, 2002, the appellant's counsel informed the juvenile court that she had not received a copy of the report. The subsequent colloquy between the juvenile court and counsel revealed that DFS had sent the report to the District Attorney, who had provided a copy to the GAL, but not to the appellant's counsel. After the hearing, the GAL gave counsel a copy of the report, but that copy was not identical to one received a week later from DFS.

2. Chapter 2, Sections 3(a)(e) and 4(a)(i) of the DFS Rules require institution of a safety assessment and a safety plan for each child within twenty-four hours and completion within seven days. The juvenile court ordered such assessment on December 5, 2001, but none was ever done.

3. Wyo. Stat. Ann. § 14-3-427(b) provides that "[a]fter a petition is filed alleging a child is neglected, the court shall appoint [an MDT]." The juvenile court order entered on December 5, 2001, included a provision "that

---

**3.** For instance, the appellant's appellate brief makes the following non-record-based accusations:

(Mother's attorney has been told, by other attorneys not involved in this case, the trial judge does not like Mother's attorney using expert witnesses. The implication is that it confines the trial judge's ability to use his discretion in crafting decisions.)

. . .

So, if the court will not follow what seems to be a clear statement of procedure, i.e., to set a trial within sixty (60) days, how can the Department of Family Services be expected to follow its rules and regulations or the law? One is not an excuse for the other, although the trial court can and did excuse the other, the Department of Family Services, from compliance.

[an MDT] shall convene in the interest of the minor for the purpose of providing recommendations to the Court." When the appellant's counsel informed the juvenile court at the hearing on February 21, 2002, that an MDT had not met, the juvenile court agreed with the GAL that an MDT would not be appropriate until there was an adjudication of neglect.

4. As part of her complaint that no MDT meeting had occurred, the appellant argues that the MDT should meet no later than sixty days after the initial hearing, because that is the time limit for holding an adjudicatory hearing under Wyo. Stat. Ann. § 14–3–426(b) (LexisNexis 2003). Having noted that deadline, the appellant then argues that the juvenile court's practice of ignoring the sixty-day requirement and setting adjudicatory hearings only upon motion ignored "a clear statement of procedure...."

[¶ 23] We decline to address the merits of these inter-related issues and we affirm the adjudication of the juvenile court to that extent. The portion of the appellant's appellate brief that concerns these matters is eight-and-one-half-pages in length. In those pages, the appellant cites to only one case in support of her position. That case, *MB v. Laramie County Dept. of Family Services in Interest of LB*, 933 P.2d 1126, 1127 (Wyo. 1997), involved an action for termination of parental rights under Wyo. Stat. Ann. § 14–2–309(a) (1981), rather than a neglect petition under Wyo. Stat. Ann. § 14–3–402(a). Beyond a cursory comparison of the two situations with the contention that "parental rights may be terminated as a result of a neglect petition," the appellant makes no effort to provide cogent legal analysis. The mere showing that a statute or court rule has been breached, without more, does not establish cause for this Court to overturn the findings and conclusions of a trial court after a bench trial.

[¶ 24] Not only does the appellant fail to support her grievances with citations to relevant precedent, she also fails to show how the alleged deficiencies in the juvenile court prejudiced her. In *MB*, 933 P.2d at 1130, we reversed an order terminating parental rights because DFS's failure to follow its own regulations prevented MB from receiving adequate notice that DFS intended to seek termination of her parental rights if she did not succeed in her case plan. In the present case, however, even if we accept the appellant's allegations as true, she has not shown how her rights were adversely affected by her delayed receipt of the pre-disposition report, by the lack of a safety assessment and report, or by the juvenile court's decision to delay the convening of an MDT meeting until neglect was actually found at an adjudicatory hearing.[4] Neither has she shown the need for a separate DFS investigation and substantiation of neglect where there has been an investigation by law enforcement officers, a petition filed by the district attorney, and an adjudicatory hearing in juvenile court.[5] And finally, the appellant has not shown that any harm resulted from the alleged lack of formal written reports and a written case plan[6] or how she was damaged

---

4. In cases of alleged neglect, it is not unusual for counsel to advise parents not to participate in or cooperate with an MDT, for fear of jeopardizing the defense of the case. Furthermore, where a court utilizes the MDT primarily for disposition recommendations, there is the potential for wasted effort if no adjudication of neglect is made. That appears to have been the concern of the juvenile court in the instant case. In agreeing to delay the convening of an MDT meeting, the juvenile court judge commented, "Well, I guess I don't know how we can have an MDT for a recommendation as to disposition when we don't have an adjudication as to abuse or neglect."

5. Under Wyo. Stat. Ann. § 14–3–411 (LexisNexis 2003), DFS is to provide assistance to the district attorney in making an investigation. It seems likely that the intent of the legislature is that DFS make its own investigation and findings where the matter has not been submitted to law enforcement and the district attorney. Or, a separate administrative investigation may be required for DFS's own administrative purposes. These concerns, and their impact on the judicial adjudicative process, have not been raised.

6. Once again, in *MB*, we found that the absence of a written case plan under the facts of that case adversely affected the parent's ability to comply with the plan and did not provide her with sufficient knowledge that termination of her parental rights could follow failure of the plan. *MB*, 933 P.2d at 1130. There are no facts presented in the instant case from which we can make a similar determination.

by the delay in setting the adjudicatory hearing.[7]

[¶ 25] We do not retreat from our conviction that the judicial system must be diligent in protecting parental rights. Nor do we imply with this decision that DFS, or any other administrative agency, is free to ignore state statutes, agency rules, or court orders. However, appellants must come to this Court with particularized facts showing the alleged harm caused by the alleged breaches of statutory, administrative, or court-imposed duties. The appellate process exists to review litigated cases, not to superintend administrative agencies.

**DID THE JUVENILE COURT ABUSE ITS DISCRETION BY APPOINTING THE ATTORNEY FOR ONE OR MORE OF THE CHILDREN TO ACT AS GUARDIAN AD LITEM (GAL) FOR THE CHILDREN?**

■ [¶ 26] Wyo. Stat. Ann. § 14–3–211(a) (LexisNexis 2003) provides as follows:

The court shall appoint counsel to represent any child in a court proceeding in which the child is alleged to be abused or neglected. Any attorney representing a child under this section shall also serve as the child's guardian ad litem unless a guardian ad litem has been appointed by the court. The attorney or guardian ad litem shall be charged with representation of the child's best interest.

In turn, Wyo. Stat. Ann. § 14–3–416 (LexisNexis 2003) provides as follows:

The court shall appoint a guardian ad litem for a child who is a party to proceedings under this act if the child has no parent, guardian or custodian appearing in his behalf or if the interests of the parents, guardian or custodian are adverse to the best interest of the child. A party to the proceedings or employee or representative thereof shall not be appointed guardian ad litem for the child.[8]

[¶ 27] These seemingly straightforward statutory directives have led to considerable litigation in recent years, a review of which will help to put this issue in perspective. The problem is that the role of the GAL and the role of counsel are not identical, yet the same person has frequently been called upon to fill both pairs of shoes. In *Matter of Parental Rights of PP*, 648 P.2d 512, 517–18 (Wyo.1982), *overruled by Clark v. Alexander,* 953 P.2d 145 (Wyo.1998), a case involving a petition to terminate parental rights, we dealt with the problem as follows:

The guardian ad litem was an attorney at law. She was afforded an opportunity to make an opening statement and to cross-examine all witnesses. She did cross-examine most of them. After closing arguments by appellee and CP, the court called upon the guardian ad litem. She began by saying that she was making a report to the court. CP objected to a report-type presentation as distinguished from a closing argument. The court advised that it would:

"* * * consider it in the nature of a report from the guardian ad litem and similar to a social report."

CP contends that it was error to do so. The guardian ad litem reported that she had reviewed appellee's records and school records; that she talked to those who had testified, to CP's friends, to one of her landladies, to the foster parents into whose custody PP had been temporarily placed, to PP and to others; and that she had observed CP and PP's interaction on several occasions. She recommended termination of CP's parental rights in PP.

In representing the ward's interests, the guardian ad litem should express to the court that which he considers will further

7. We held in *In Interest of MFB*, 860 P.2d 1140, 1148 (Wyo.1993), that the purpose of the requirement of an adjudicatory hearing within sixty days was to prevent prolonged pre-hearing detention of the child. The children in the instant case were in foster care, rather than detention, but the appellant did not cite *In Interest of MFB* and did not directly argue that the purpose of the time requirement should be equally applicable to the latter situation.

8. As used in Wyo. Stat. Ann. § 14–3–416, "this act" refers to the Child Protection Act, under which neglect petitions are brought. *See* Wyo. Stat. Ann. § 14–3–402(a)(xviii). This, of course, is only one of many circumstances under which a GAL may be appointed. Others include divorce, paternity, and parental rights termination. The principles enunciated in this case would seem to apply to GAL's in all of those situations.

such interest. This is often done during a hearing by accepting the presentation and argument of the guardian ad litem favorable to one side or the other as the guardian ad litem believes is in the best interest of the child. Otherwise, the purpose in an appointment of a guardian ad litem would be thwarted. If the guardian ad litem were other than an attorney at law, his position on behalf of the child could be obtained only through his testimony or in some fashion other than actual participation as an attorney in the hearing. The position of a guardian ad litem who is also an attorney at law can be obtained through such actual participation, i.e., during legal argument, cross-examination of witnesses, etc. But it need not be so restricted. The position of the guardian ad litem was here presented in the form of a report "similar to a social report" in which the guardian ad litem made her recommendation.

. . .

Although it would have been more appropriate to have limited the guardian ad litem, who had participated in the trial as an attorney at law, to a conventional closing argument with opportunity during trial to present any proper factual matters by means of admissible evidence, whatever error may have resulted from receipt of the report without opportunity for cross-examination is harmless in this instance. That reported by the guardian ad litem was only a restatement of some of that already said and otherwise evidenced during the hearing.

[¶ 28] The specific problem identified in *Matter of Parental Rights of PP*—participation in the proceedings as an attorney by a GAL who has also presented first-person factual evidence—was found to be error, but was considered harmless because it was merely cumulative. *Id.* Several years later, in a divorce action involving an attorney/GAL, we discussed the ethical considerations that may arise from such a dual role. *Moore v. Moore*, 809 P.2d 261, 263–65 (Wyo. 1991). Prior to announcing his child custody decision, the district judge informed counsel that he had discussed the matter with the GAL. Neither party objected at the time, but

in this Court, the appellant sought reversal on the basis of this *ex parte* contact. We held that both the Code of Judicial Conduct and the Rules of Professional Conduct for Attorneys at Law forbade such contact:

> We are satisfied that those rules were applicable in this instance. A guardian *ad litem* is the attorney for the minor whom he is appointed to serve.... He participates in the proceedings as an advocate.... In Wyoming, that rule is consistent with policy articulated by the legislature in two specific statutes requiring, or permitting, the appointment of a guardian *ad litem* since, in each statute, the guardian is charged with representing the child.... In accordance with the foregoing authority, we perceive it to be unequivocal that the guardian *ad litem* has the same ethical responsibilities in the proceeding as any other attorney. The specific subject matter of this case is succinctly summarized in this way:
>
> > " * * * Guardians *ad litem* may not have *ex parte* communications with the judge." Podell, *The Role of the Guardian Ad Litem*, 25 Trial 31, 34 (April 1989).

*Moore*, 809 P.2d at 264. We concluded, however, that, inasmuch as judgment was entered in favor of a party who was not responsible for and did not participate in the ethical impropriety, and inasmuch as the appellant had not objected below, we could find no manifest injustice and we affirmed the district court. *Id.* at 264–65.

[¶ 29] Two years after *Moore* was published, we again considered the role of the GAL, this time in the context of a neglect proceeding brought pursuant to Wyo. Stat. Ann. §§ 14–6–201—14–6–252 (1986 & Cum. Supp.1993). Without distinguishing between GAL's who are attorneys and GAL's who are not attorneys, we stated in *In Interest of MFB*, 860 P.2d 1140, 1152 (Wyo.1993), that GAL's "must act with reasonable diligence in the role of an advocate," and must "participate as necessary in all phases of the process, including subsequent appeals," and we concluded that GAL's are subject to the Rules of Professional Conduct for Attorneys at Law. Slightly over two years later, howev-

er, in an opinion once again making no distinction between attorney/GAL's and non-attorney/GAL's, we made no mention of the Rules of Professional Conduct for Attorneys at Law, but stated, instead, that the GAL may file a written report with the court rather than make an in-court presentation. *Basolo v. Basolo,* 907 P.2d 348, 356 (Wyo. 1995). Further, we observed that "[e]ven those who criticize the best interests of the child standard as indeterminate recognize the value of the guardian ad litem's *subjective* impressions to a court's decisions concerning custody and visitation." *Id.* (emphasis in original). The recitation of his or her subjective impressions is not, of course, an appropriate role for an attorney.

[¶ 30] We continued to blur the line between GAL and attorney in *In re Paternity of IC,* 941 P.2d 46 (Wyo.1997). As suggested by its caption, *IC* was neither a neglect case nor a parental rights termination case. Rather, it was a paternity action brought by a presumed father under Wyo. Stat. Ann. § 14–2–102 (Michie 1994). *In re Paternity of IC,* 941 P.2d at 49. In the context of child custody, support, and visitation, we described the role of the appointed GAL as follows:

> As the appointed attorney for the minor, a guardian ad litem is obligated to participate as an advocate for the child. "[T]he guardian ad litem has the same ethical responsibilities in the proceeding as any other attorney," *Moore v. Moore,* 809 P.2d 261, 264 (Wyo.1991), and has a responsibility to ensure that the record contains information relative to the child's best interest and welfare, factors essential to the court's final determination. . . . The guardian ad litem here, however, produced no evidence on behalf of the Child at the visitation and support hearing.

*In re Paternity of IC,* 941 P.2d at 52. As before, we did not recognize separate roles for the GAL and the attorney.

[¶ 31] Finally, in *Clark v. Alexander,* 953 P.2d 145, 151–55 (Wyo.1998), we squarely addressed the difficulties inherent in asking one person to act both as an agent of the court, identifying and pursuing the child's best interests, and as an attorney for the child, identifying and pursuing the child's preferences. Despite those difficulties, and because of the prohibitive cost of appointing both a GAL and an attorney for the child, we adopted a "hybrid" role for the attorney/GAL. *Id.* at 153. The effect of such hybrid status is to excuse the attorney/GAL from application of some of the Rules of Professional Conduct for Attorneys at Law.[9] At the same time, however, we made clear in *Clark* that an attorney/GAL may not be a fact witness. *Id.* at 154.[10]

[¶ 32] Perhaps understandably, problems continue to arise as the trial courts work out the mechanics of the attorney/GAL's hybrid representation of children. In *Pace v. Pace,* 2001 WY 43, ¶¶ 22–26, 22 P.3d 861, 868–70 (Wyo.2001), we clarified our holdings in *Moore* and *Clark,* and we repeated their two central admonitions: the Rules of Professional Conduct for Attorneys at Law, as modified in *Clark,* apply to attorney/GAL's, and the attorney/GAL may not appear as a fact witness. Finally, we summarized what attorney/GAL's are expected to do in representing the best interests of children:

> A guardian ad litem, counsel, and the court should work together at the beginning of a case to develop and articulate clearly the scope and nature of the guardian ad litem's responsibilities. Full investigations of the facts relevant to [the issues before the court] should be completed by the guardian ad litem, including interviewing witnesses deemed appropriate by the guardian ad litem, custody evaluators, if any, counselors, teachers, relatives, and friends. Based on the evidence, input from any experts, and their own best judgment, the guardians ad litem will develop their rec-

---

9. For instance, as perceived by *Clark,* the attorney/GAL is bound by the child's best interests, not by the child's expressed preferences, and attorney-client confidentiality is modified so that relevant information may be provided to the court in the child's best interests. *Clark,* 953 P.2d at 153–54.

10. For a critical review of the *Clark* decision, *see* Jennifer Paige Hanft, *Attorney for Child Versus Guardian Ad Litem: Wyoming Creates a Hybrid, But Is It a Formula for Malpractice?,* XXXIV Land & Water L.Rev. 381 (1999).

ommendations concerning [the issues]. They should communicate with the parents' counsel, preferably in writing, regarding the proposed recommendations sufficiently in advance of trial to allow them to prepare evidence in response to the recommendations. If the parties agree, those recommendations should be provided to the court prior to trial. To fulfill their obligations to the children they represent, guardians ad litem must take the necessary steps to assure sufficient evidence is presented at trial either by introducing the evidence themselves or assuring counsel for one or both parents are prepared to do so. Finally, guardians ad litem should present their recommendations to the court in the form of closing argument and not through personal testimony.

*Pace,* 2001 WY 43, ¶ 26, 22 P.3d at 870.

[¶ 33] Our most recent experience with this issue was in *Robbins v. Robbins,* 2002 WY 80, 46 P.3d 880 (Wyo.2002). The parties in a divorce action had agreed to the appointment of an attorney to act as GAL for their child, and they had further stipulated both that the GAL could testify at trial and that her report could be introduced into evidence. *Id.,* 2002 WY 80, ¶ 1, 46 P.3d at 881. After trial, the district court denied the mother's motion for a new trial, in which motion the mother alleged error in the court allowing the GAL to testify. *Id.,* 2002 WY 80, ¶ 6, 46 P.3d at 882. We affirmed on two grounds: first, that the mother could not identify how the GAL's testimony created any injustice; and second, that, to the extent error occurred, it was invited error. *Id.,* 2002 WY 80, ¶¶ 9–10, 46 P.3d at 883.

[¶ 34] It is within this legal framework that we must consider the appellant's argu-

ments in the present case. Unfortunately, as with her other contentions, much of the appellant's claim in this regard consists of innuendo and rhetoric rather than cogent factual presentation and legal argument.[11] As best as we can determine, her specific complaints are: (1) the GAL appointment order was not entered for nearly three months after the petition was filed, during which period the person appointed as GAL had been acting as attorney for the children; (2) the GAL was aware of the intrusiveness of the grandparents and CW into the appellant's relationship with her children, yet the GAL actively supported visitation between the grandparents, CW and the children; (3) the GAL did not adequately distinguish the individual children's preferences; (4) the GAL did not adequately distinguish his role as an attorney from his role as GAL; (5) there never was an order appointing the GAL as the children's attorney; (6) Wyo. Stat. Ann. § 14–3–416 does not recognize hybrid representation and does not allow for appointment of an attorney/GAL; and (7) the record sometimes refers to the children's GAL and sometimes to their attorney.

[¶ 35] The appellant is certainly correct that the record is less than clear as to how John Frentheway (Frentheway) first became involved in this case. His first appearance was at the initial hearing on January 3, 2002, where he was addressed by the court as the GAL, even though his order of appointment as GAL was not entered until February 28, 2002. There is also some confusion in the record as to his status as attorney for the children. While he is referred to on the title page of each hearing or trial transcript as GAL, he is referred to in the juvenile court orders that followed as the children's attor-

---

11. The "flavor" or "tenor" of the appellant's argument is reflected in this passage from her appellate brief:

   After John Frentheway was appointed as guardian ad litem, during which of his court appearances did he appear as the children's guardian ad litem? As the children's attorney? As their legal representative? During the course of a hearing or trial, did he change roles? On which of the children's behalf did he appear? All of them? One of them? Two of them? If so, which two? Sometimes was

he representing one child and at other times, was he representing other of the children? How did the court, or the District Attorney, or Mother know when he was changing roles or which of the children he was representing?

   Mother cries foul. How can she know how to defend herself when John Frentheway is a moving, invisible target? How can any party, even his own clients or the court, comprehend his posture in the case at any given moment? They cannot.

ney.[12]

[¶ 36] We cannot help but conclude that there is no substance to this argument. To begin with, it is based on the appellant's mistaken belief that the same person cannot serve as both GAL and attorney. Since one person can fulfill both roles under the hybrid concept of *Clark*, it is not necessary that the person be specifically identified as one or the other. In addition, there does not seem to have been any actual confusion at the time; everyone knew that Frentheway was an attorney who had been appointed GAL. There was only one order of appointment, and that was as GAL. Even the appellant's counsel referred to Frentheway as the GAL. And the juvenile court judge made a specific finding that Frentheway was the GAL.

[¶ 37] The appellant's complaint that Frentheway, an attorney, was appointed as GAL must fail for two other reasons. First, the record is clear that Frentheway's participation in motion hearings and at trial was within the boundaries we set forth in *Moore*, *Clark*, and *Pace*. He questioned witnesses and presented argument, but he did not, himself, appear as a witness. And second, the appellant can point to no prejudice that resulted from Frentheway's appointment or the hybrid role he played. A close reading of the record and of the appellant's appellate brief indicates that the appellant's objections to Frentheway are actually based on Frentheway's siding with the State on the neglect issue and Frentheway's support for the idea of visitation between the children and their grandparents.

WAS THE APPELLANT DENIED PROCEDURAL DUE PROCESS IN THE JUVENILE COURT PROCEEDINGS DUE TO THE ABSENCE OF MEANINGFUL NOTICE AND AN OPPORTUNITY TO BE HEARD?

[¶ 38] Wyo. Const. art. 1, § 6, provides that "[n]o person shall be deprived of life, liberty or property without due process of law." The similar provision found in the Fifth Amendment to the United States Constitution was made applicable to the states by the Fourteenth Amendment. "Notice and the opportunity to be heard are touch stones of this due process of law." *Pecha v. Smith, Keller & Associates*, 942 P.2d 387, 391 (Wyo.1997). The notice and hearing opportunity must be "appropriate to the nature of the case," and the opportunity to be heard must be " 'at a meaningful time and in a meaningful manner.' " *Jones v. Jones*, 903 P.2d 545, 548 (Wyo.1995) (*quoting Moore v. Board of Educ. of Fulton Public School No. 58*, 836 S.W.2d 943, 947 (Mo. 1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1270, 122 L.Ed.2d 666 (1993)). The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. *Meyer v. Norman*, 780 P.2d 283, 289 (Wyo.1989). The question is whether there has been a denial of fundamental fairness. *Id.*

[¶ 39] Actions infringing upon the parent-child relationship may affect fundamental rights, thereby entitling parents to due process. *Matter of SAJ*, 942 P.2d 407, 409 (Wyo.1997) (custody and visitation); *MB*, 933 P.2d at 1129 (parental rights termination). Not all such infringements, however, are of the same magnitude. *See A v. X, Y, and Z*, 641 P.2d 1222, 1226 (Wyo.), *cert. denied*, 459 U.S. 1021, 103 S.Ct. 388, 74 L.Ed.2d 518 (1982) (under equal protection challenge, strict scrutiny not required of legislative classification disallowing non-family member from attacking a presumption of paternity). Termination of parental rights, for instance, requires clear and convincing evidence. Wyo. Stat. Ann. § 14-2-309 (LexisNexis 2003); *MB*, 933 P.2d at 1129. Child neglect, on the other hand, need only be shown by a preponderance of the evidence. Wyo. Stat. Ann. § 14-3-425(a) (LexisNexis 2003). In the realm of due process, this is consonant with the requirement that notice and the opportunity to be heard must be appropriate to the nature of the case.

[¶ 40] The chronology of events is important in understanding the appellant's due process argument. The underlying incident

---

12. A surmise strongly supported by the record is that the orders were basically form orders emanating from the district attorney's office, and that those form orders simply mistakenly referred to attorney rather than GAL.

occurred on December 2, 2001. The petition was filed and a temporary shelter care hearing was held two days later. The juvenile court judge left the children in DFS custody for continued shelter care. On December 21, 2001, an Order Setting Arraignment was entered. That order provided simply that "the above entitled matter be, and the same is hereby set for ARRAIGNMENT" on January 3, 2002. The arraignment, sometimes also called an initial appearance or initial hearing, took place as scheduled. Statutory guidance as to the purpose of the initial hearing is found in Wyo. Stat. Ann. § 14–3–426(a):

> At their initial hearing, which may be held after a shelter care hearing or a transfer hearing, the child and his parents, guardian or custodian shall be advised by the court of their rights under law and as provided in this act. They shall also be advised of the specific allegations in the petition and given an opportunity to admit or deny them. They shall also be advised of the possible liability for costs of treatment or services pursuant to this act. It is not necessary at the initial appearance for the district attorney to establish probable cause to believe the allegations in the petition are true.

[¶ 41]   During the initial hearing, the appellant denied the allegations of the petition. The juvenile court noted the denial and ordered that the matter be set for trial on motion of a party. The GAL then orally moved the juvenile court for an order allowing the children to have visitation with the grandparents and CW. Counsel for the appellant objected to the juvenile court's consideration of the motion because the appellant had not received notice that the issue would be raised at the initial hearing. Counsel also advised the juvenile court that there was significant controversy among family members and that testimony would be required for a proper decision. The GAL responded that the children had always had close relationships with these relatives and that a sudden disruption of those relationships would be detrimental to the children. The juvenile court granted the motion.

[¶ 42]   In this appeal, the appellant contends both that she was given no notice that the visitation issue would arise at the initial hearing and that she was not given an opportunity to present evidence on the matter. For several reasons, we conclude that the facts of this case, when viewed in their totality, do not establish that the appellant's right to due process was violated. To begin with, while Wyo. Stat. Ann. § 14–3–426(a) says nothing about other matters being raised at the initial hearing, Wyo. Stat. Ann. § 14–3–426(f) provides that "[a]t any time prior to disposition under W.S. 14–3–429, the court, on motion of any party or on its own motion, may reconsider its order regarding shelter care or conditions of release made under W.S. 14–3–409 or 14–3–414." Certainly, that is some notice to the parent that issues involving the conditions of shelter care may arise at any time. Furthermore, the very nature of shelter care requires near-emergency responses to unexpected issues that arise in the days and weeks following the filing of a neglect petition. It must be remembered that, under due process analysis, the notice and opportunity to be heard are to be appropriate to the nature of the case.

[¶ 43]   There is a further and even more substantive reason that the appellant's due process argument must fail. On January 15, 2002, the appellant filed a motion seeking in part the juvenile court's reconsideration of the visitation order. That motion was heard on February 21, 2002. At the hearing, the appellant's counsel introduced exhibits, produced witnesses, cross-examined the witnesses produced by the State and the GAL, and argued the motion. Clearly, this was meaningful notice and a meaningful opportunity to be heard.

**WAS THE APPELLANT DENIED PROCEDURAL DUE PROCESS IN THE JUVENILE COURT PROCEEDINGS BY THE FAILURE TO MEET THE REQUIREMENTS OF W.R.C.P. 58?**

[¶ 44]   In Wyoming, written judgments and orders generally are prepared by the successful party. In criminal cases and in juvenile court, the State frequently drafts most orders. This practice of allowing one side to prepare court orders requires a pro-

cess whereby the other side can review them before they are signed by the judge. Read together, W.R.Cr.P. 1 and W.R.C.P. 58 provide that process, which is the same for civil, criminal, and juvenile matters. The substantive provisions are found in W.R.C.P. 58(a):

> Subject to the provisions of Rule 55(b) and unless otherwise ordered by the court, written judgments or orders shall be presented to the court within 20 days after its decision is made known. Before submitting the judgment or order, the party drafting it shall seek to secure the written approval as to form of the other parties. If, within 10 days, approval as to form is not obtained, the party drafting the form of judgment or order may forward the original to the court and serve a copy on the other parties with a notice advising objections must be made within 10 days. If no written objection is timely filed, the court may sign the judgment or order. If objection is filed, the court will resolve the matter with or without a hearing. A party objecting shall submit an alternative form of judgment or order with the objection.

[¶ 45] The appellant first raised this issue at the February 21, 2002, motion hearing when she informed the juvenile court that the orders being entered in the case were not being circulated for approval as to form. In its response, the State made no pretense of any attempt to follow W.R.C.P. 58:

> [ASSISTANT DISTRICT ATTORNEY]: Your Honor, as the Court is well aware both from our work in juvenile cases and our work in adult cases, the district attorney's office has a huge number of orders that it prepares. It would be absolutely unwielding [*sic*] for us to contact each and every defense attorney and hold those orders both from your signature and

from [filing] with the court until each attorney made it into our office.

> It is the standard practice of our office to have the orders prepared within 48 to 72 hours. We do, generally, hold them for approximately five business days after. If the attorneys have not presented themselves to review and sign the orders, they are submitted to the Court unsigned.

[¶ 46] In resolving this dispute, the juvenile court also made no effort to see that W.R.C.P. 58 was followed:

> THE COURT: Okay.

> Well, you're on notice that if you want to review orders before they're submitted, you have five days after the district attorney's office prepares them, at which time you will go to the office and look at them and register objections, or sign off on the order. It seems to me a reasonable period of time, is a pretty standard practice, and we'll just have to proceed on that basis in this case.

> Could you have someone call [the appellant's counsel] and advise her when an order's ready?

[¶ 47] The related questions that this issue *should* raise are (1) whether W.R.C.P. 58(a) is mandatory, and (2) if so, what is the effect of a failure to abide by the rule? It would be helpful to consider whether the Wyoming Rules of Civil Procedure, generally, are mandatory,[13] whether use of the word "shall" makes the specific provisions of W.R.C.P. 58(a) mandatory,[14] and why W.R.C.P. 58 differs from its federal counterpart.[15] Likewise, does the excepting phrase, "unless otherwise ordered by the court," apply to all the requirements of subsection (a), or just to the twenty-day presentment deadline contained in the first sentence?

---

**13.** *See, for example, Loghry v. Loghry,* 920 P.2d 664, 668 (Wyo.1996); *Sandstrom v. Sandstrom,* 884 P.2d 968, 971 (Wyo.1994); *Matter of the Estate of Obra,* 749 P.2d 272, 275 (Wyo.1988); and *Larsen v. Roberts,* 676 P.2d 1046, 1048 (Wyo. 1984).

**14.** *See, for example, In re LePage,* 2001 WY 26, ¶ 11, 18 P.3d 1177, 1180 (Wyo.2001); *State By and Through Dept. of Family Services v. Jennings,* 818 P.2d 1149, 1150 (Wyo.1991); and *Mayland v. State,* 568 P.2d 897, 899 (Wyo.1977). It is

possible for "shall" to be directory, rather than mandatory. *Wyoming State Treasurer v. City of Casper,* 551 P.2d 687, 699 (Wyo.1976). For instance, "shall" may be directory where there is no stated "penalty" for a violation. *In re Lambert,* 53 Wyo. 241, 80 P.2d 425, 428 (1938).

**15.** *See,* Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, 11 *Federal Practice and Procedure* §§ 2781 and 2786 (2d ed.1995).

[¶ 48]   These are pertinent questions, but the appellant has not raised them nor has she made any effort to answer them. In fact, the appellant does not cite to a single case or other authority in support of her W.R.C.P. 58(a) argument.[16]   Where a party fails to present cogent argument supported by pertinent authority, we will not consider the matter. *In re KD*, 2001 WY 61, ¶ 8, 26 P.3d 1035, 1036 (Wyo.2001); *Small v. Convenience Plus Partners, Ltd.*, 6 P.3d 1254, 1256 (Wyo.2000).   The appellant hints in her appellate brief that she was prejudiced because the first order in the case did not coincide with the record from that hearing, but she fails even to suggest what that prejudice was.   Similarly, she complains that her attorney was not contacted to approve later orders as to form, but she makes no effort to ascribe to this failure any particular errors in fact in such orders.   Nothing has been provided to this Court that would justify reversing the juvenile court on this issue.

**WAS THE APPELLANT DENIED PROCEDURAL DUE PROCESS IN THE JUVENILE COURT PROCEEDINGS BY THE ARBITRARY DENIAL OF MOTIONS FOR CONTINUANCE WHEN RULE REQUIREMENTS HAVE BEEN MET?**

[¶ 49]   On April 5, 2002, the GAL filed a document entitled Motion for Consideration to Allow the Minors to Participate in Athletic Activities and Request for Hearing. Despite the breadth of its title, it is clear from the body of the motion and from the hearing transcript that the sole purpose of the motion was to obtain the juvenile court's approval of the oldest child's participation in a school swimming program.   An order setting the motion for hearing on April 11, 2002, was hand delivered to the appellant's counsel on April 9, 2002.   The next day, the appellant's counsel filed a motion seeking continuance of the hearing because counsel would be unavailable due to a previously scheduled deposition.

[¶ 50]   The hearing was held as scheduled. Substitute counsel again sought a continuance, citing regular counsel's absence due to the deposition and the appellant's absence due to her work schedule.[17]   The oral motion for continuance was denied, substitute counsel called no witnesses and made no arguments, and the GAL's motion was granted.

[¶ 51]   The appellant presents three arguments to this Court in support of her contention that it was error for the juvenile court to deny the continuance: (1) W.R.C.P. 6(c) and (d) require that motions shall be served at least thirteen days before the hearing;[18]   (2) Rule 201 of the Uniform Rules of the District Courts (URDC) provides that "[c]ontinuances will be granted only for good cause shown"; and (3) the GAL misrepresented to the juvenile court the facts as to the appellant's objections to her daughter's participation in swimming.   Finally, the appellant contends that it was arbitrary and capricious for the juvenile court to rely on the statements and recommendations of the GAL at the hearing.

---

16.   The appellant's argument on this issue is simply a continuation of her diatribe against the juvenile court:

   Mother's counsel remembers ten or more years ago when opposing counsel were routinely called when *Orders* were completed by the District Attorney's office so that review and signature could be made.   When the practice of the District Attorney's office changed is unknown, but it should not have been changed.

   How is anyone; i.e., local counsel, pro se litigants, out of town counsel, new counsel or the public apprised of the District Attorney's local "rule of practice" which supercedes the Wyoming Rules of Civil Procedure?   Wyoming Court Rules Annotated are circulated to all practicing Wyoming attorneys, are found in law libraries all over the state and readily accessible to the public.   Is it any wonder out-of-county attorneys express their incredulous-

ness about the way justice is administered in Laramie County, Wyoming District Court and their distain therefore?   There are too many nuances and pitfalls which deprive parties of their rights.   It allows "those-in-the-know" who know the "unwritten" rules of practice to run roughshod over the unsuspecting, the naïve and the not-so-naïve.

17.   In her appellate brief, the appellant states that she filed an amended motion for continuance on the day of the hearing, alleging these and additional grounds.   However, no such amended motion is contained in the record on appeal.

18.   The appellant argues for thirteen days, rather than ten, because she claims the GAL's motion was served upon her court mailbox, not upon her personally.

[¶ 52] "The granting of a continuance is a matter for the discretion of the trial court and its ruling will not be disturbed on appeal without a clear abuse of that discretion." *In Interest of MFB*, 860 P.2d at 1149; *see also Jones*, 903 P.2d at 547.

" 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985).' "

*In re Board of County Com'rs, Sublette County*, 2001 WY 91, ¶ 11, 33 P.3d 107, 112 (Wyo.2001) (*quoting Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998)). "An abuse of discretion occurs when the trial court could not reasonably conclude as it did." *In re Board of County Com'rs, Sublette County*, 2001 WY 91, ¶ 11, 33 P.3d at 112. "There is a heavy burden placed upon an appellant to show such abuse." *Id.*

[¶ 53] In another context, that being review of administrative agency action, we have said that the determination of whether that action was arbitrary, capricious, or an abuse of discretion requires this Court to look to whether the agency's decision is based on a consideration of relevant factors and whether it is rational. *Taylor v. Wyoming Bd. of Medicine*, 930 P.2d 973, 975 (Wyo.1997). Were we to apply that standard in the instant case, we would be inclined to conclude that the juvenile court did not consider relevant factors in denying the appellant's motion for a continuance.[19] However, at the risk of redundancy, we will point out that, as with other issues, the appellant has not identified the appropriate standard of review for this issue, and she has cited no authority, other than W.R.C.P. 6 and U.R.D.C. 202, themselves, in support of her position. Furthermore, she has not even claimed, no less identified, any harm or prejudice that resulted from denial of the continuance. As a result of the hearing, the children were allowed to participate in their schools' swim-

ming programs. There is no evidence in the record, nor does the appellant argue, that this caused her any hardship, financial or otherwise, or created any risk or harm to the children. We do not even know if the children actually took up swimming. As with other issues, the appellant has failed to support her contentions with cogent legal argument based on pertinent authority, and she has shown no prejudice.

### DID THE JUVENILE COURT ERR IN FINDING NEGLECT UNDER WYO. STAT. ANN. § 14–3–402(A)(XII)(A) (LEXISNEXIS 2003)?

[¶ 54] Contrary to the dictates of W.R.A.P. 7.01(f)(2), the appellant's appellate brief does not contain "a concise statement of the applicable standard of review" as to this issue. As part of the "Conclusion" section of her appellate brief, the appellant does define the term "abuse of discretion." It appears that she may have intended to argue that this standard governs all the issues of the case. We perceive, as did DFS in its appellate brief, that this issue actually presents a question as to the sufficiency of the evidence.

In reviewing a record for sufficient evidence to sustain a finding of neglect, we:

"1. Give considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;

2. Examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee;

3. Assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn."

*MP v. State in Interest of CP*, 965 P.2d 1155, 1157 (Wyo.1998) (*quoting In Interest of N.M.*, 794 P.2d 564, 565 (Wyo.1990) and *Matter of RJP*, 761 P.2d 1000, 1002 (Wyo.1988)). The State had to prove neglect by a preponderance of the evidence, which means that it

---

19. Both the appellant and her attorney appeared to have good reasons for requesting the continuance, and two days' notice is so short as to call

into question the due process concept of meaningful notice and a meaningful opportunity to be heard.

had to prove it was more likely than not that neglect occurred. *Id.*

[¶ 55] The neglect petition in the instant case was based on Wyo. Stat. Ann. § 14–3–402(a)(xii)(A), which defines "neglected child" as a child "[w]hose custodian has failed or refused to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being[.]" The petition alleged not only the events of December 2, 2001, but also that the appellant had a severe alcohol and drug problem, that the children were afraid to go home, and that DDH was extremely despondent and had recently threatened suicide.

[¶ 56] Nine witnesses testified during the two-day adjudicatory hearing: three called by the State, five called by the appellant, and one called by the GAL. The juvenile court entered its Findings of Fact and Conclusions of Law on June 11, 2002. The juvenile court's findings covered both the events of December 2, 2001, and the inter-family relationships and problems. Based on those findings, the juvenile court concluded that the children were neglected under the statutory definition.

[¶ 57] In her appellate brief, the appellant contends that the family's difficulties had been caused by the intrusive meddling of her parents and CW, that the children are well-behaved and well-mannered, that neither the appellant nor the children have been in trouble with the law, and that the juvenile court's comments during the hearing suggest that it believed the appellant was charged with psychological and emotional abuse of the children. She also complains that her proposed expert witness was not allowed to testify as to the effect of her father's interference.[20]

[¶ 58] The appellant's approach to this issue is contrary to our standard of review. We do not review the record to determine whether there is evidence to support the appellant's position. Rather, as outlined above, we disregard the appellant's evidence and assume the appellee's evidence is true. Consequently, the appellant's recitation of the evidence she believes establishes the "manipulation and subversiveness" of her fa-

ther is of no avail. The question is whether the evidence, examined in the light most favorable to the State, and with conflicts therein resolved in favor of the State, leads to the conclusion that, more likely than not, the children were neglected.

[¶ 59] When we apply the proper standard, we find sufficient evidence of neglect. The transcript is replete with testimony that could have been relied upon by the juvenile court in reaching its conclusion. DDH could not locate the appellant at home, so she called the VFW bar, having memorized the telephone number from frequent calls there. The appellant and her boyfriend went to the VFW bar and consumed alcohol nearly every night. DDH, her grandfather, and two police officers were of the opinion that the appellant was drunk when contacted at the VFW and later at her home. The appellant admitted she had consumed five beers and a shot of tequila. The appellant's boyfriend threatened her father with physical violence. The appellant's boyfriend had threatened the children with physical violence and called them inappropriate things, such as "slut, whore, bitch, retard, stupid, dumb, moron." Although the children were usually locked in the basement at such times, DDH had witnessed the appellant and a previous boyfriend using controlled substances—a white powder that they "sniffed"—on more than one occasion. The appellant and her boyfriend would "grope each other" in front of the children. The appellant's conduct led to family arguments and fighting. DDH recently had attempted, or at least threatened, suicide.

[¶ 60] It simply cannot be that this testimony, if believed by the juvenile court, was insufficient to establish that neglect had occurred. Almost by definition, these circumstances constitute the failure or refusal to provide the adequate care, maintenance, and supervision necessary for the children's well being.

## IS THE JUVENILE COURT'S ORDER FOR TRANSFER OF PHYSICAL PLACEMENT UPON MOTION HEARING AN APPEALABLE ORDER?

[¶ 61] This Court reviews judgments and "appealable orders" of the district

---

20. The appellant has not raised as a separate issue the juvenile court's W.R.E. 702 ruling, and

she has not presented argument or authority on that ruling.

courts. W.R.A.P. 1.04(a). For purposes of this case, an order affecting a substantial right in a special proceeding is an appealable order. W.R.A.P. 1.05(b). Proceedings in juvenile court are special proceedings and both adjudication and disposition affect substantial rights. *In Interest of MFB*, 860 P.2d at 1147; *State in Interest of C*, 638 P.2d 165, 168–70 (Wyo.1981).

[¶ 62] The State's contention in the instant case is that the July 3, 2002, order was simply an interlocutory placement order pending disposition, and it is therefore not appealable. The State points to an Order Setting Further Disposition filed October 1, 2002, as proof that disposition had not yet occurred when the July 3, 2002, order was entered. We do not agree with the State's interpretation of the documents in the record. While the October 1, 2002, setting order may be the first record use of the word "disposition," it is noteworthy that the order actually refers to "further disposition," an obvious implication that initial disposition has occurred. Furthermore, the October 1, 2002, setting order was filed after the appeal was taken, which raises the question of whether it should be considered. Beyond that, however, is the fact that the July 3, 2002, order goes far beyond temporary placement pending disposition. For instance, it includes the following language:

> **IT IS FURTHER ORDERED** that the Laramie County Field Office of the Wyoming Department of Family Services shall monitor the provisions of services in accordance with a continuing case plan of working towards family reunification.

> **IT IS FURTHER ORDERED** that the Laramie County Field Office of the Wyoming Department of Family Services shall provide the Court with reports of the parent's progress and behavior not less than every three (3) months and shall make such recommendation for further disposition as indicated.

> **IT IS FURTHER ORDERED** that no later than six (6) months from entry of this Order that the Laramie County Field Office of the Wyoming Department of Family Services shall advise this Court if the plan for working toward family reunification

has not been achieved, at which time this Court shall set a hearing in this matter.

[¶ 63] Wyo. Stat. Ann. § 14–3–402(a)(i) defines "adjudication" as "a finding by the court or the jury, incorporated in a decree, as to the truth of the facts alleged in the petition[.]" The document entitled Findings of Fact and Conclusions of Law filed June 11, 2002, specifically referred to this definition and included a specific finding that "[t]he Court finds that the facts alleged in the petition are true." The juvenile court's intent seems to have been that the Findings of Fact and Conclusions of Law would act as a decree of adjudication. Clearly, Wyo. Stat. Ann. § 14–3–402(a)(i) contemplates a separate decree. In addition, Wyo. Stat. Ann. § 14–3–426(c) requires entry of a decree:

> If after an adjudicatory hearing or a valid admission or confession the court or jury finds that a child is neglected, it shall enter a decree to that effect stating the jurisdictional facts upon which the decree is based. It may then proceed immediately or at a postponed hearing within sixty (60) days to make proper disposition of the child.

[¶ 64] The absence of a decree in this case is troublesome, but it has not directly been raised as an issue. Similarly, the July 3, 2002, order does not appear to meet the statutory qualifications for a disposition order, but that also has not been addressed. *See* Wyo. Stat. Ann. § 14–3–429 (LexisNexis 2003). We have treated both the June 11, 2002, Findings of Fact and Conclusions of Law and the July 3, 2002, Order for Transfer of Physical Placement Upon Motion Hearing as appealable orders because they had the effect of an adjudicatory decree and a dispositional order, and they affected the appellant's substantial rights.

**DID THE JUVENILE COURT ERR IN ALLOWING THE CHILDREN TO HAVE VISITATION WITH THEIR GRANDPARENTS AND AUNT?**

[¶ 65] Some of the procedural history of this case requires repeating in order to place this issue in context. The children were placed in shelter care on December 2, 2001. A neglect petition was filed two days later. At the initial hearing on the petition, the juvenile court granted the GAL's oral motion to allow the children to visit with

their grandparents and aunt. Soon thereafter, the appellant filed a motion, one part of which requested reconsideration of the visitation order. That motion was denied after a hearing. Several months later, after the adjudicatory hearing, the GAL filed a motion to change the children's foster placement to the home of the aunt, CW. That motion was granted over the appellant's objection, by an order dated July 3, 2002.

[¶ 66] The appellant's Notice of Appeal stated that appeal was being taken from the order finding neglect and from the July 3, 2002, order mentioned above. The challenged visitation was authorized first when the juvenile court granted the GAL's oral motion at the initial hearing, it was authorized again when the juvenile court denied reconsideration of that decision, and it was authorized a third time as part of the July 3, 2002, order changing placement. The appellant's appellate brief relies heavily on testimony from the May 2002 adjudicatory hearing in arguing against visitation. In its appellate brief, the State does not discuss this issue.

[¶ 67] As is consistent with the rest of the appellant's brief, the section dealing with this issue contains neither a statement as to the standard of review nor citation to pertinent legal authority. We assume, because of the general reference to "abuse of discretion" in the conclusion section of the appellant's appellate brief, that it is her position that such is the standard of review for all the issues of the case. Without cogent argument provided by counsel, we are not inclined to venture on our own into determining whether that is the appropriate standard of review for this issue or whether review should be for sufficiency of the evidence.[21] The best that can be said for the appellant's argument in this appeal is that, despite the juvenile court's repeated rulings, the appellant continues to believe that visitation between the children and their grandparents is a bad idea. Even if we

agreed, we cannot substitute our judgment for that of the juvenile court.

[¶ 68] More than once, the juvenile court heard testimony and argument about the inter-family relationships, and it made specific findings as to the grandparents' historic role in the children's lives. Although the appellant certainly produced evidence that the grandparents and aunt did, indeed, meddle in the appellant's family affairs, it cannot be said that the great weight of the evidence was to that effect. There was considerable evidence supporting the juvenile court's conclusion that the children benefited from their association with their grandparents. Whether measured under an abuse of discretion standard, or as a question of sufficiency of the evidence, the appellant has not shown that the decision of the juvenile court was in error.

## CONCLUSION

[¶ 69] On all issues raised in this appeal, the appellant has either failed to show that the juvenile court erred in the particular manner alleged, or has failed to show that she was prejudiced by any such error, or both. The record contains sufficient evidence to sustain the juvenile court's conclusion that the children were neglected under the statutory definition. Further, the record reveals that the juvenile court did not act arbitrarily or capriciously in granting visitation between the children and their grandparents and aunt. To the contrary, the juvenile court heard the matter thoroughly and repeatedly, and there was sufficient evidence in the record to sustain its visitation decisions.

[¶ 70] We affirm.

GOLDEN, Justice, dissenting, in which HILL, Chief Justice, joins.

[¶ 71] I respectfully dissent. I do not believe that leaving one's children with their grandparents, being intoxicated to an un-

---

**21.** The thought arises that the standard could be different, even as to the issue of visitation, depending upon the circumstances of the decision. Do we review a pretrial visitation decision that is part of temporary shelter care in the same manner that we review a visitation decision that is

part of an adjudicatory order? Is the former decision even reviewable; that is, is it an appealable order? Questions such as this are neither asked nor answered in the parties' appellate briefs.

known degree on one occasion, or being uncooperative with law enforcement legally constitutes neglect. I also believe many serious mistakes were made during the course of the proceedings below that deserve comment and that such comment is a proper use of this Court's supervisory authority over juvenile courts. Wyo. Const. Art. 5, § 2 ("The supreme court shall have general appellate jurisdiction, co-extensive with the state, in both civil and criminal causes, and shall have a general superintending control over all inferior courts, under such rules and regulations as may be prescribed by law.").

[¶ 72] I preface my remarks by stating that I am approaching this case from both broad and narrow perspectives. The narrow perspective involves analyzing the facts of this particular case. There is no doubt this family has serious problems, and the children should not be returned to Mother without careful, individualized review. After all, the overriding goal of a proceeding under the Child Protection Act is to protect children. A finding that the allegations in the petition do not constitute legally cognizable neglect in no way prevents the state from either amending its petition in this case or filing a new petition, as may be appropriate.

[¶ 73] The broad perspective involves analyzing this case within the context of the Child Protection Act. The Child Protection Act requires balance between protecting children and timely establishing a permanent living arrangement for the children. With exceptions, the general goal in a child protection proceeding is either family reunification or termination of parental rights, freeing the children for adoption. This balance serves the best interest of all children. Unfortunately, this balance has not been achieved in this proceeding.

[¶ 74] I agree that neither brief provides much guidance to this Court. Mother's brief is a general diatribe upon the juvenile court process. While this does not help this Court resolve the current situation, it does reveal a seriously dysfunctional juvenile court system. Certainly the safety of the children is the primary concern, but the ultimate goal of the juvenile system is to maintain the family unit whenever safely and reasonably possible. In

this case, the record discloses that no efforts were made to reunify this mother with her three children before adjudication.

[¶ 75] Physical custody and adjudication of neglect are two distinct aspects of a juvenile court action. With regard to physical custody, the Child Protection Act very clearly requires reasonable efforts to maintain children in their home and reasonable efforts to reunify the family if the children must be removed from the home. At the informal shelter care hearing, the juvenile court made a finding in its order that the state was complying with these reasonable efforts requirements. A review of the transcript from that hearing, however, reveals that the issue of reasonable efforts was never discussed. The findings, therefore, are completely unsupported by the evidence. Indeed, a review of the entire record reveals that no reasonable efforts to reunify this family were ever implemented before adjudication.

[¶ 76] The statutory reasonable efforts requirement begins immediately upon the removal of a child from the home. The heart of reasonable efforts to reunify a family is a case plan, created with the cooperation and consultation of family members, DFS and an MDT. Although the juvenile court timely ordered an MDT to convene, no MDT was ever appointed or convened. More disturbingly, there is no indication that a case plan was ever created and adopted. Child specific case plans provide the juvenile court with a means to determine the appropriate goals for the family and gauge the progress of the family in achieving these goals, with reunification being the required result when safely and reasonably possible. Without a case plan and constant evaluation thereof, there are no concrete criteria by which a parent's behavior and progress can be measured. Ultimately, the lack of a case plan results in there being no means by which a parent can regain custody of his or her children. This result flies in the face of the constitutional dimension of the right to familial association and the language of the Child Protection Act.

[¶ 77] The state justified the absence of an MDT by stating that the convening of an MDT is not appropriate before adjudication. The essence of the argument presented by

the state is that convening an MDT (and thereby effectuating case planning) is potentially a wasted effort if the parent is denying all allegations. As mentioned above, adjudication and custody are two distinct aspects of a juvenile court proceeding. The Child Protection Act clearly contemplates that attempts to reunify the family must begin immediately. Wyo. Stat. Ann. § 14–3–427 (LexisNexis 2003) contemplates an MDT being appointed as soon as possible after a petition is filed. The MDT is specifically required to review each child's individual situation for the purpose of making case planning recommendations. § 14–3–427(e). The parent's denial of the allegations is simply a factor to be weighed in determining appropriate case plan options. The statute specifically provides that the recommendations of the MDT are not to be considered by the juvenile court before adjudication without the consent of the child and the parent. § 14–3–427(h). This section clearly anticipates that the MDT will be functioning before adjudication.

[¶ 78] The Act also contains other provisions that require case planning to begin immediately upon the filing of the petition if a child is removed from the home. Wyo. Stat. Ann. § 14–3–429(a)(iv) (LexisNexis 2003) requires the juvenile court at adjudication to:

> ensure that reasonable efforts were made by the department of family services to prevent or eliminate the need for removal of the child from the child's home or to make it possible for the child to return to the child's home. Before placing a child outside of the home, the court shall find by clear and convincing evidence that to return the child to the child's home would not be in the best interest of the child despite efforts that have been made[.]

Further, Wyo. Stat. Ann. § 14–3–431(c) (LexisNexis 2003) mandates that the juvenile court:

> shall conduct a review hearing six (6) months from the date of the child's removal from the home, twelve (12) months from the date of the child's removal from the

home, and not less than once every twelve (12) months thereafter. At each of these review hearings the court shall review the case plan to determine:

> (i) The health and safety of the child;

> (ii) The continuing necessity for the placement;

> (iii) The appropriateness of the current placement;

> (iv) The reasonableness of efforts made to reunify the family and the consistency of those efforts with the case plan;

> (v) The appropriateness of the case plan and the extent of compliance with the case plan including the permanent placement of the child;

> (vi) If progress has been made toward alleviating or mitigating the causes necessitating placement outside the home and the extent of that progress; and

> (vii) The date the child is expected to be returned to the home or placed for adoption or legal guardianship.

The time requirements for these case plan reviews by the juvenile court run from the date the child is removed from the home. It is important that these time frames are followed because § 14–3–431(d) mandates:

> When a child has been placed in foster care under the responsibility of the state for fifteen (15) of the most recent twenty-two (22) months the state shall file a petition to terminate parental rights or seek to be joined as a party to the petition if a petition has been filed by another party, unless:

> (i) The child is in the care of a relative;

> (ii) The state agency has documented in the case plan a compelling reason for determining that filing the petition is not in the best interest of the child; or

> (iii) The state agency has not provided services to the child's family deemed to be necessary for the safe return of the child to the home, if reasonable efforts described in W.S. 14–3–440 are required to be made.[1]

---

1. I do not perceive this subsection as being intended to excuse the total absence of reasonable efforts at reunification. A child's best interests could never be served by including a catch-all subsection that effectively writes out all other

[¶ 79] The statutory framework reveals that the critical action invoking the beginning of reasonable efforts to reunify the family is the removal of a child from her home. Because the process potentially leads to the termination of parental rights, due process concerns permeate the entire proceedings. Even if termination of parental rights is not statutorily required, it is always in the best interests of the child to effect permanency and, if circumstances allow, family reunification as quickly as possible.

[¶ 80] In the instant proceeding, no case plan was ever developed. There was never any specific finding by clear and convincing evidence in the order of adjudication that the return of the children to their home would not be in their best interests. There is no indication that the situation of each child was evaluated individually to determine what was best for each, individual child. There are no case plan reviews as required under § 14-3-431(c) (obviously a futile activity given the absence of case plans). The juvenile court refused to even consider Mother's motion for the return of her children filed January 15, 2002.[2] Even if the juvenile court had entertained the motion, because there was no case plan and no MDT, there would have been little if any information available to the juvenile court upon which it could make an informed decision based upon the objectively determined best interests of each, individual child.

[¶ 81] Further, not only was this mother separated from her children, the juvenile court seemingly even refused to acknowledge that Mother retained certain residual parental rights.[3] At the hearing on Mother's motion for return of her children, the juvenile court commented that Mother maintained no supervisory authority over the children. The juvenile court repeatedly deferred to the recommendations of the GAL over the express objections of Mother, without taking evidence. Mother's wishes were given seemingly little to no weight. This is not to say that a parent can micromanage the lives of her children when her children have been placed in the legal custody of the state. The right to make certain major decisions, however, remains with the parent.

[¶ 82] The lack of an MDT and a case plan takes on even more significance in this case because Mother and the GAL disagreed on what was best for the children on several occasions.[4] This case presents disturbing family dynamics. There are strong indications that actions of the grandfather and possibly the aunt (Mother's sister) are negatively affecting the relationship between Mother and the children. The juvenile court, however, granted visitation to these family members, over Mother's objection, solely upon the recommendation of the GAL.[5] The juvenile court also has ordered placement of the children with the aunt, again solely upon the recommendation of the GAL. Whether such visitation and placement are in the best interests of the children is undetermined. No evidence has been presented. An MDT would have independently evaluated the fam-

provisions regarding reasonable efforts in the Child Protection Act.

2. The majority opinion suggests this motion was considered and denied. The transcript from the hearing reveals otherwise.

3. Residual parental rights are defined in part at Wyo. Stat. Ann. § 14-3-402(a)(xvi) (LexisNexis 2003).

4. For instance, Mother refused to give her oldest daughter permission to participate in a school swimming program because of perceived health concerns (Mother is a certified nurse). The GAL filed a motion to allow the daughter to swim. At a hearing that neither Mother nor her regular counsel could appear because of short notice, the juvenile court granted the motion of the GAL without taking evidence.

5. Mother objects that her due process rights were violated when the GAL made an oral motion for family visitation at the initial hearing. Mother's objection is well-taken. "Parents are entitled to due process in custody and visitation matters, which includes adequate notice and an opportunity to be heard." *Matter of SAJ*, 942 P.2d 407, 409 (Wyo.1997) ("The district court abused its discretion in modifying Mother's visitation ... without affording a meaningful opportunity to be heard or otherwise providing for development of the evidentiary record." *Id.* at 410.). Especially with the negative family dynamics alleged in this case, more care should have been taken. There is no indication that the issue of visitation was an "emergency" that required an immediate decision.

ily dynamics and objectively decided what was in the best interests of these children, thus putting more confidence in any decision reached by the juvenile court.

[¶ 83] In short, a review of the record in this case reveals an utter disregard for the provisions of the Child Protection Act dealing with child custody, family reunification and permanency. Having said this, however, I also must emphasize that Mother shares the burden of ensuring the system functions appropriately. The defects noted above do not affect the jurisdiction of the juvenile court. The remedy for alleged violations of statutory directives or due process violations is first to request appropriate action from the juvenile court. If the juvenile court does not act, the remedy then is to seek review from this Court. *See generally, In Interest of MFB,* 860 P.2d 1140 (Wyo.1993); *In Interest of WM,* 778 P.2d 1106 (Wyo.1989). Further, if Mother were truly interested in improving family life for her children, she could have voluntarily undertaken to resolve some of the obvious issues even without a case plan and then present the juvenile court with evidence of her efforts. The record reveals that every party to these proceedings has failed these children.

[¶ 84] Mother also complains about the appointment of John Frentheway as the GAL in this action. While her argument is poorly presented, I perceive the issue Mother to be raising as a very focused issue. The issue is not, as the majority opinion suggests, whether an attorney can be both a GAL and an attorney for a child. The issue Mother raises is actually one of statutory interpretation. Mother argues that if Frentheway was the attorney for the children, his appointment as GAL violates Wyo. Stat. Ann. § 14–3–416, which prohibits the juvenile court from ap-

pointing a representative of any party to a Child Protection proceeding as GAL. The majority opinion also recognizes the potential implication of Wyo. Stat. Ann. § 14–3–211. Section 14–3–211 requires a court appointed attorney for a child to also represent the child's best interests. Under the facts of this case, however, § 14–3–211 does not apply because Frentheway was never appointed by the court to act as the attorney for the children.[6] Thus, § 14–3–416 controls. If Frentheway was acting as attorney for the children before his court appointment as GAL, he would have been a representative of a party (the children) and should not have been appointed GAL.

[¶ 85] It thus becomes important to determine exactly what role Frentheway is playing in the juvenile court proceeding. The problem is that his initial role in this action is uncertain. The record is replete with implications of Frentheway's acting as the attorney for the children. However, his authority to represent the children as their attorney is never disclosed. Mother did not hire him to represent the children. He was not appointed by the juvenile court, either as a private attorney or as a public defender.[7] It is even unclear if he was claiming to represent all three children or only the oldest child.[8] Thus, the representation of the children is very unclear. Even after the juvenile court finally appointed Frentheway to be the GAL for the children on February 28, 2002, Frentheway continued to be referred to as both the attorney for the children as well as the children's GAL.[9]

[¶ 86] Because the record is unclear as to Frentheway's role, Mother has failed to meet her burden of proving that the statute was violated. It is not appropriate to make any

---

6. We are not faced with the question whether the juvenile court is statutorily required to appoint an attorney for the child in every proceeding in which a child is alleged to be abused or neglected.

7. If the public defender's office is representing children in alleged neglect cases, hopefully it is doing so consistently and uniformly throughout the state.

8. Representing all three children in any capacity raises serious concerns about conflict of interest.

9. The order appointing Frentheway as the children's GAL is ambiguous in itself. Its title refers only to the appointment of a GAL, but its language states that Frentheway is appointed to "represent the minor child/children in the above entitled matter, and shall act as Guardian Ad Litem to advocate for the best interest of said minor child/children." The language, and especially the use of the conjunctive "and" could be interpreted as the juvenile court making a dual appointment.

assumptions as to Frentheway's role before his appointment by the juvenile court. I strongly suggest, however, that the juvenile court resolve this issue. Every party to these proceedings has a right to know Frentheway's role. The juvenile court should immediately clarify Frentheway's status. If Frentheway is acting as attorney for the children, his authority should be made explicit and he should be removed as GAL if his attorney role began before his appointment as GAL. If Frentheway has always been acting as the GAL for the children, the juvenile court must ensure Frentheway is properly appointed as GAL at the beginning of proceedings. This is not a minor technicality. Legal representation of children is critically important in juvenile proceedings. These children had no court appointed legal representation until almost three months after the petition was filed. Further, although one person can fulfill both roles, the roles are distinct, with distinct obligations. Everyone involved in the proceeding, most especially the children, must know exactly who is representing the children and in what capacity.[10]

[¶ 87] Returning now to the narrow perspective, the heart of Mother's appeal is her challenge to the adjudication of neglect. The petition alleges one incident.[11] While one, isolated incident certainly can constitute legal neglect, the single incident as alleged in this case does not present an issue of legal abuse or neglect. At best the allegations in the petition suggest that Mother and her boyfriend were intoxicated to an unknown degree and, upon being informed that her children would not be returned to her, she became agitated and uncooperative with law enforcement. The children, however, were with their grandparents, where Mother had delivered them. For their part, the children did not want to return home because they believed Mother was drunk. The oldest child was particularly adamant about refusing to return home, threatening suicide if she was returned to her mother.[12] While certainly this allegation indicates a dysfunctional family with serious problems, the allegation includes no indication of legally cognizable neglect. The children were safely provided for by the grandparents, at least initially at mother's request.

[¶ 88] I do not question the propriety of taking the children into protective custody. Under the circumstances, taking protective custody of the children was a prudent action. I do not even question whether neglect or emotional abuse due to substance abuse or other problems exist in this family. That question is not before this Court. Such allegations were not charged in the petition, and, therefore, this Court should not review the evidence or offer any opinion on such potential allegations. Should the State choose to allege continuing behaviors that constitute abuse or neglect, it may do so.

[¶ 89] The fact, however, is that Mother had no prior notice that her entire lifestyle and prior history would be available to support a nebulous adjudication of neglect.[13] Mother was defending against the single incident alleged in the petition. I do not

10. There are also payment issues and ethical issues raised by an attorney appearing in a juvenile court proceeding without express authorization.

11. The majority opinion states that the petition alleges Mother had a severe drug and alcohol problem. In fact, the petition states that the children "reported that their mother has a severe alcohol and drug problem and that they were scared to go home with her." This is not an allegation by the state against Mother. It is a statement from the children, presumably included in the petition to justify emergency shelter care. (The eldest daughter, at the adjudicatory hearing, stated that she had only seen her mother ingesting illegal drugs "maybe once or twice" and that she had not seen her mother use drugs for at least 3 years.)

12. Both the allegation and the majority opinion state that the oldest daughter had previously attempted suicide. The daughter, however, testified at the adjudicatory hearing that she had only threatened suicide to get attention. On that occasion, Mother immediately took her to the emergency room of the hospital. After admitting to the psychiatrist from the behavioral health unit that she was only bluffing, she was counseled and then released to her mother.

13. As stated in the majority opinion, the juvenile court used "DH's relationships with male partners whom she brought into the home, and her 'alcohol-centered lifestyle' " as a basis for his decision.

perceive the allegation that Mother was intoxicated to an unknown extent on this one occasion to open the door to a generalized allegation of neglect through continued substance abuse. I do not perceive the mention of Mother's boyfriend in the petition as opening the door to an allegation of neglect through Mother's failure to protect the children from boyfriend's emotional abuse. While further allegations may be supported by evidence adduced during the course of these proceedings, the petition has never been amended to include such allegations. Due process considerations require that a parent have adequate notice of the specific allegations against him or her.

[¶ 90] I would reverse the adjudication of neglect under the specific facts of this case. A parent does not neglect her child by placing the child with a caregiver. Further, it is not the function of the juvenile court or this Court to moralize on a person's lifestyle. Whether or not this, or any, court agrees with how this single mother is raising her children is irrelevant. The only issue is whether Mother is neglecting or abusing her children as defined in the Child Protection Act. Certainly this family has problems. The Child Protection Act requires the State to take a focused approach to helping the family resolve its problems, not just separate antagonistic parties and then disappear until formal adjudication.

[¶ 91] That said above brings me back to the physical custody of the children. This family has been kept apart for almost two years, with no hope for reunification because there has been no case plan. The right to familial association is a fundamental right. *CH v. Campbell County D–Pass*, 699 P.2d 830, 833 (Wyo.1985) (appellant has a "fundamental right to have care and custody of her own child"). The right belongs not only to parents, but also to children. By failing to create circumstances under which reunification could be achieved, the juvenile court system and every participant therein have failed these children.[14]

---

14. This is particularly disturbing because there are indications that, initially, only the oldest child was adamant about not returning to Moth-

[¶ 92] Unfortunately, there is no remedy except to remand the case to the juvenile court for proceedings in compliance with the Child Protection Act. Assuming the petition is amended or a new petition is filed, an MDT immediately should evaluate the situation of each child individually to determine the best interests of that child. Case plans for each child must be developed and reasonable efforts must be made by the State to reunify this family or at least individual children with the mother if safely possible. The questions of visitation and physical placement of the children must be reviewed. Ultimately, it is the responsibility of all the parties to cooperate and timely determine the actions necessary in the best interests of the children.

[¶ 93] The juvenile court must guide the process. This includes conducting the statutorily required case plan reviews and, when appropriate, the juvenile court must make a finding, by clear and convincing evidence for each individual child, that return to the child's home would not be in the best interest of that child (§ 14–3–429(a)(iv)). Time is of the essence. Do it.

er, and at least one of the children has always wanted to return to Mother.