2011 WY 91

Hugh and Lee HAGEMAN, as parents and next friends of C and LH; Dewey and Dinelle Hageman, as parents and next friends of T, M and WH; Robert and Johanna Abernathy, as parents and next friends of TA; Chad and Sandy Arnett, as parents and next friends of K, T and TA; Greg and Jolene Bebo, as parents and next friends of N, J and MB; Mark and Rose Bebo, as grandparents and next friends of N, J and MB; Todd and Anne Berry, as parents and next friends of L and CB; Richard and Lucinda Breedlove, as parents and next friends of RWB; Jerry and Kim Bremer, as parents and next friends of CB; Eric and Shelly Duncan, as parents and next friends of J and ID; Dan Ellis, as the parent and next friend of ZE; Cory and Dawn Gilchriest, as parents and next friends of C and SG; Eddie and Tami Greenwald, as parents and next friends of K and MG; Shawn and Marlisa Hall, as parents and next friends of H and JH; J.L. and Sherri Herbst, as parents and next friends of BH; Byron and Donna Juma, as parents and next friends of B, S, C and TJ; Shane and Cherie Limmer, as parents and next friends of C and ML; Jeff and Kari McClun, as parents and next friends of K, K and KM; Marla McNees, as parent and next friend of PM; Brett A. Meyer, as parent and next friend of G, K, and TM; Paul and Christine Miller, as parents and next friend of P, S and PM; Jeff Mueller, as parent and next friend of C and TM; Lois A. Paules, as grandmother of J and DG; Alvin and Rennae Ruiz, as parents and next friends of LR; Tim and Michele Toedter; Rocky and Paula Vaughn, as parents and next friends of C and MV; Terry and Mary Viktorin; Shane Viktorin; David and Susan Walker; as parents and best friends of T and EW; Russell and JoAnne Walter, as parents and next friends of KW; Michael and Gretchen Wollert, as parents and next friends of C, T G, and GW, Appellants (Plaintiffs),

v.

The GOSHEN COUNTY SCHOOL DISTRICT NO. 1; Ray Schulte, in his official capacity as Superintendent of Goshen County School District No. 1; Linda Kessler, Linda Johnson, Clark House, Brent Kaufman, Jim Eddington, Ed Jolovich, Charlie Harshberger, and Rob Branham, in their official capacities as members of the Board of Trustees of the Goshen County School District No. 1, Appellees (Defendants).

No. S–10–0009.

Supreme Court of Wyoming.

June 6, 2011.

Representing Appellants: Kara Brighton and Harriet M. Hageman, Hageman & Brighton, PC, Cheyenne, Wyoming. Argument by Ms. Hageman.

Representing Appellees: Tracy J. Copenhaver, Copenhaver, Kath, Kitchen & Kolpitcke, LLC, Powell, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

BURKE, Justice.

[¶ 1]  In an effort to address a perceived drug and alcohol problem among its students, Goshen County School District No. 1 adopted a policy requiring all students who participate in extracurricular activities to consent to random testing for alcohol and drugs.  Appellants initiated litigation, claiming that the Policy is unconstitutional.  The district court granted summary judgment in favor of the School District.  Appellants challenge that decision in this appeal.  We affirm.

### ISSUES

[¶ 2]  These issues were raised by the Appellants and adopted by the Appellees:

1. Whether the district court erred in refusing to declare that the District's "Mandatory Drug Testing for Students Involved in Extracurricular Activities" violates [the prohibition against unreasonable searches and seizures of] Article 1, § 4 of the Wyoming Constitution.

2. Whether the district court erred in refusing to declare that the District's Drug Testing Policy violates Article 1, §§ 2 and 3 of the Wyoming Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

3. Whether the district court erred in refusing to declare that the District's Drug Testing Policy violates Article 1, § 6 of the Wyoming Constitution, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

4. Whether the district court erred in refusing to enjoin the District from implementing the Drug Testing Policy.

5. Whether the district court erred in granting the District's Motion for Summary Judgment.

### FACTS

[¶ 3]  For the past several years, Goshen County School District No. 1 has participated in surveys of its students, known as the "Wyoming Youth Risk Surveys."  According to the affidavit of the School District's Superintendent, the surveys revealed "a serious prevalence of alcohol and drug use among Goshen County School District No. 1 students.  Goshen County has ranged at or near the top for alcohol and drug use for several of those surveys."  The School District participated in another statewide survey in 2008, the "Wyoming Prevention Needs Assessment State Profile Report."  This survey indicated that:

[I]n 2008 26% of our sixth graders had used alcohol at some point, 10% had used cigarettes; and 6% inhalants, with 4% of the sixth graders having used inhalants within the past 30 days; 3% of our sixth graders reported binge drinking; 33% of Goshen County eighth graders were perceived to be at risk [of] harm [from] drug

* Chief Justice at time of oral argument.

use; 41% of tenth grade students were perceived to be at risk [of] harm [from] drug use; 47% had friends who use drugs; ... 44% were deemed to have favorable attitudes toward drug use; 52% of twelfth grade students were at risk [of] harm [from] drug use; 40% expressed an intent to use; 43% had friends who used drugs; ... 50% were classified as at risk for early initiation of drug use.

Concern over the pervasiveness of drug and alcohol use among its students prompted the School District to hold a public forum on February 2, 2009, to discuss the possibility of requiring students to take random drug and alcohol tests. Following that forum, on April 14, 2009, the School District's Board of Trustees adopted a new policy requiring all students in grades 7 through 12 who participate in extracurricular activities to consent to random testing for drugs and alcohol. According to the School District's Superintendent:

> The policy recognizes that many of the students participating in extracurricular activities are viewed as role models to other students and that it is important that they avoid drug and alcohol use in their position as role models. It is also the position of the Board that to achieve the goal of reducing risks of alcohol and drug abuse and to maximize the skills and talents participating in extracurricular activities, it is important that participants refrain from drug and alcohol use. It is the belief of our school district that this policy will assist in that endeavor.

Testing is done chiefly through urinalysis, although testing may also be done with saliva or breath samples.

■ [¶ 4] Appellants, referred to collectively as the Coalition, are a group of students and their parents or guardians [1] who filed a declaratory judgment action in district court seeking to have the School District's Policy declared unconstitutional. After briefing and argument, the district court concluded that the drug testing program did not violate either the Wyoming Constitution or the United States Constitution. It granted summary judgment in favor of the School District, and the Coalition appealed.

### STANDARD OF REVIEW

■ [¶ 5] We review a district court's decision granting summary judgment using this standard of review:

> Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c); *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo.2002). "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Id.* Because summary judgment involves a purely legal determination, we undertake *de novo* review of a trial court's summary judgment decision. *Glenn v. Union Pacific R.R. Co.*, 2008 WY 16, ¶ 6, 176 P.3d 640, 642 (Wyo.2008).

*Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, ¶ 8, 191 P.3d 125, 128–29 (Wyo.2008). In the case before us now, the Coalition and the School District agree that there are no genuine issues of material fact. They disagree, however, about whether the district court correctly applied the provisions of the Wyoming and United States Constitutions to the undisputed facts. "Issues arising under the constitution are questions of law which we review *de novo*." *Bush v. State*, 2008 WY 108, ¶ 48, 193 P.3d

---

1. As the district court observed, the Coalition includes several named plaintiffs who may lack standing to bring these claims, including, for example, at least one person who had already graduated from high school and was no longer subject to the drug testing policy. But as also pointed out by the district court, it has been established by affidavits that at least two of the students named as plaintiffs have been tested pursuant to the drug testing policy. Based on the standing of at least those two members of the Coalition and their parents, we agree with the district court's conclusion that the Coalition has standing in this matter. *See Northfork Citizens for Responsible Development v. Park County Bd. of County Comm'rs*, 2008 WY 88, ¶ 8, 189 P.3d 260, 262 (Wyo.2008); *International Ass'n of Fire Fighters, Local No. 279 v. Civil Service Comm'n of Fire Department of City of Cheyenne*, 702 P.2d 1294, 1298 (Wyo.1985) (Thomas, C.J., specially concurring).

203, 214 (Wyo.2008); *Wilkening v. State,* 2007 WY 187, ¶ 6, 172 P.3d 385, 386 (Wyo. 2007).

## DISCUSSION

### Search and Seizure

[¶ 6] The Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution prohibit unreasonable searches and seizures. *See Pena v. State,* 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo.2004). The parties agree, as do we, that the drug tests mandated by the Policy are searches for purposes of constitutional analysis. *See ALJ v. State,* 836 P.2d 307, 311 (Wyo.1992) ("[T]he testing of urine is a search."); *Doles v. State,* 994 P.2d 315, 318 (Wyo.1999) ("Obtaining a blood or saliva sample is a search and seizure implicating Fourth Amendment privacy rights."). Generally, the Coalition contends that the searches at issue here are unreasonable, and therefore unconstitutional.

[¶ 7] The Coalition concedes that the Policy does not violate the Fourth Amendment to the United States Constitution. It contends, however, that Article 1, § 4 of the Wyoming Constitution provides greater protections, under the facts of this case, than those afforded by the Fourth Amendment. In support of this contention, the Coalition relies heavily on *Vasquez v. State,* 990 P.2d 476 (Wyo.1999) and *O'Boyle v. State,* 2005 WY 83, 117 P.3d 401 (Wyo.2005). In *Vasquez,* we considered the United States Supreme Court's decision in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which established a rule "that when a police officer has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Vasquez,* 990 P.2d at 480. Applying *Belton,* we concluded that the search of Mr. Vasquez's vehicle satisfied the Fourth Amendment to the United States

Constitution. That did not end our analysis, however, because we also recognized that Article 1, § 4 of the Wyoming Constitution provided a separate and independent source of state constitutional rights. *Id.* at 486. We rejected the bright-line rule of *Belton,* and instead held that the Wyoming Constitution "requires a search be reasonable under all of the circumstances." *Id.* at 489. "Is this result a narrower application than Belton?" we asked. "We think so." *Id.*[2]

[¶ 8] In *O'Boyle,* we observed that, "[i]n the specific context presented in *Vasquez,* i.e. a vehicle search incident to an arrest, we said Wyoming's search and seizure provision provided greater protection than the federal provision" because the Wyoming Constitution "requires that searches and seizures be reasonable under all the circumstances." *Id.,* ¶¶ 30–31, 117 P.3d at 410. We then extended the same "reasonable under all the circumstances" analysis to a traffic stop and detention, and concluded that Mr. O'Boyle's lengthy detention and "extensive questioning" were unreasonable under the circumstances, and therefore contrary to Article 1, § 4 of the Wyoming Constitution. *Id.,* ¶ 32, 117 P.3d at 410–11.

[¶ 9] Both *Vasquez* and *O'Boyle* dealt with searches by police in the criminal law context. We have never before considered what limitations the Wyoming Constitution may place, in the context of an administrative search, on a school's testing of students for alcohol and drugs. This "is a matter of first impression in Wyoming, so we therefore look to other jurisdictions for guidance." *Hofstad v. Christie,* 2010 WY 134, ¶ 10, 240 P.3d 816, 819 (Wyo.2010); *Taylor v. Schukei Family Trust,* 996 P.2d 13, 18 (Wyo.2000); *Edwards v. Fogarty,* 962 P.2d 879, 882 (Wyo.1998).

[¶ 10] In *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the United States Supreme Court rejected a Fourth Amendment

---

**2.** The United States Supreme Court recently revisited *Belton* and abandoned its bright-line rule. It now holds that a law enforcement officer may search the passenger compartment of a vehicle incident to an arrest only if it is reasonable to believe that the arrested person can access the vehicle at the time of the search, or that evidence of the offense for which he was arrested might be found in the vehicle. *Arizona v. Gant,* 556 U.S. 332, ——, 129 S.Ct. 1710, 1719, 173 L.Ed.2d 485 (2009).

challenge to a school district policy requiring drug testing for high school athletes. The Court declared that "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Id.* at 652, 115 S.Ct. at 2390. To determine the reasonableness of these random, suspicionless searches, the Court applied a balancing test, weighing three factors: the nature of the privacy interest at issue, *id.* at 654, 115 S.Ct. at 2391; the character of the intrusion, *id.* at 658, 115 S.Ct. at 2393; and the nature of the governmental concern and the efficacy of the policy in addressing that concern. *Id.* at 660, 115 S.Ct. at 2394. The Court concluded that public school students have a lower expectation of privacy than citizens in general, and that the expectation of privacy is even lower for student athletes. It found the search relatively unobtrusive. It determined that the school had a legitimate interest in deterring drug use, and noted that the school had presented evidence of a serious drug problem in the school, particularly among the student athletes. The drug testing program was considered an efficacious way to address the problem because it was aimed directly at the student athletes who were a major part of the problem.

[¶ 11] Seven years later, the Court decided *Board of Education of Independent School Dist. No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), again applying the basic standard of "reasonableness." This drug testing policy was not targeted at a specific group of problematical students with documented drug problems. Rather, like the Policy before us now, it subjected all students involved in extracurricular activities to random, suspicionless testing for drugs. The Court stated that all participants in extracurricular activities had a diminished expectation of privacy, and that the intrusion on that privacy was not significant. The Court concluded that the school's interest in deterring drug use prevailed over the insignificant intrusion on privacy, and thus rejected the constitutional challenge to the drug testing policy.

[¶ 12] In addition to *Vernonia* and *Earls,* we have reviewed decisions from several state courts. The majority of such cases have applied some version of the reasonableness test, and concluded that random, suspicionless drug testing of students involved in extracurricular activities did not violate the provisions of their respective state constitutions. In *Joye v. Hunterdon Central Regional High School Board of Education,* 176 N.J. 568, 618–19, 826 A.2d 624, 655 (2003), the New Jersey Supreme Court gave detailed consideration to both federal and New Jersey precedent, and concluded that "there is room in our State's constitution for school officials to attempt to rid Hunterdon Central of illegal drugs and alcohol in the manner sought here." In *Linke v. Northwestern School Corp.,* 763 N.E.2d 972, 985 (Ind.2002), the Indiana Supreme Court ruled that its state constitution "does not forbid schools from taking reasonable measures to deter drug abuse on their campuses but they must do so with due regard for the rights of students." It held that a drug testing policy similar to the one before us now did not violate the rights of the students. *See also Marble Falls Independent School Dist. v. Shell,* 2003 WL 1738417, 2003 Tex.App. LEXIS 2845 (2003); *Weber v. Oakridge School Dist. 76,* 184 Or.App. 415, 56 P.3d 504 (2002) (drug testing for student athletes); *State v. Jones,* 666 N.W.2d 142 (Iowa 2003) (random, suspicionless searches of student lockers).

[¶ 13] The Coalition cites *York v. Wahkiakum School Dist. No. 200,* 163 Wash.2d 297, 316, 178 P.3d 995, 1006 (2008), in which the Washington Supreme Court concluded that random, suspicionless testing of student athletes violated their rights under Article I, § 7 of the Washington Constitution. Article I, § 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." *Id.* at 299 n. 1, 178 P.3d at 997 n. 1. The Washington Supreme Court acknowledged that this language differs markedly from the Fourth Amendment to the United States Constitution, which states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and par-

ticularly describing the place to be searched, and the persons or things to be seized.

The court noted that, under the Fourth Amendment to the United States Constitution, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness,'" *id.* at 305–06, 178 P.3d at 1001, citing *Vernonia,* 515 U.S. at 652, 115 S.Ct. at 2390. In contrast, analysis under the Washington Constitution "hinges on whether a search has 'authority of law'—in other words, a warrant." *York,* 163 Wash.2d at 306, 178 P.3d at 1001. The Washington Supreme Court declined to follow the United States Supreme Court's analysis as reflected in *Earls,* and instead decided that, under "our article I, section 7 jurisprudence," the Court could not "countenance random searches of public school student athletes." *Id.* at 316, 178 P.3d at 1006.

[¶ 14] Article 1, § 4 of the Wyoming Constitution is much more similar to the language of the Fourth Amendment to the United States Constitution. Our state constitution reads as follows:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

Given the significant difference between the text of Article I, § 7 of the Washington Constitution and the language of Article 1, § 4 of the Wyoming Constitution, *York* provides little guidance in resolving the issue before us.

[¶ 15] The Coalition also claims that "the Pennsylvania Supreme Court struck down a drug testing policy as violative of the Pennsylvania Constitution," citing *Theodore v. Delaware Valley School Dist.,* 575 Pa. 321, 836 A.2d 76 (2003). This claim is inaccurate. The Pennsylvania Court did not say that a policy of random, suspicionless drug testing of students violated the Pennsylvania Constitution. Rather, it ruled that "such a search policy will pass constitutional scrutiny only if the [School] District makes some actual showing of the specific need for the policy and an explanation of its basis for believing that the policy would address that need." *Id.* at 348, 836 A.2d at 92. The trial court had dismissed the case on "preliminary objections in the nature of a demurrer," based solely on the pleadings and before either party had presented any evidence. *Id.* at 329, 836 A.2d at 80. Accordingly, the school district had "offered no reason to believe that a drug problem actually exists in its schools, much less that the means chosen to address any latent drug problem would actually tend to address that problem." *Id.* at 347, 836 A.2d at 91. The case was returned to the trial court to allow the parties the opportunity to present their evidence, and the Pennsylvania Court observed:

> It may be that, upon the trial of the matter, the [School] District can produce evidence of an existing drug problem as well as the success and/or failure of other means adopted to eradicate the problem, along the lines of that which ultimately convinced a majority of the New Jersey Supreme Court [in *Joye,* 176 N.J. 568, 826 A.2d 624].

*Id.* at 352, 836 A.2d at 94.

[¶ 16] Although the Pennsylvania Supreme Court was critical of certain aspects of the United States Supreme Court's decision in *Earls,* it agreed that the basic test of the constitutionality of a search under the Pennsylvania Constitution is the "reasonableness" of that search. *Theodore,* 575 Pa. at 342, 836 A.2d at 88. This statement reflects a broad theme running through all such cases. The United States Supreme Court declared in *Vernonia* that, "[a]s the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" 515 U.S. at 652, 115 S.Ct. at 2390. In *Earls,* it characterized reasonableness as "the touchstone of the constitutionality of a governmental search." 536 U.S. at 828, 122 S.Ct. at 2564. The New Jersey Supreme Court in *Joye* stated that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." 176 N.J. at 592, 826 A.2d at 639, quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct.

733, 742, 83 L.Ed.2d 720 (1985). And in *Linke,* the Indiana Supreme Court explained that "the measure of whether a government search violated Section 11 [of the Indiana Constitution] is whether the process is 'reasonable.'" 763 N.E.2d at 977.

■ [¶ 17] This unifying theme is consistent with our decisions in *Vasquez* and *O'Boyle,* where we stated that Article 1, § 4 of the Wyoming Constitution requires that searches be "reasonable under all of the circumstances." *Vasquez,* 990 P.2d at 489; *O'Boyle,* ¶ 32, 117 P.3d at 410. Based on this precedent, and having considered guidance from other jurisdictions, we will apply this same "reasonable under all of the circumstances" standard to determine whether searches undertaken pursuant to the School District's Policy violate Article 1, § 4 of the Wyoming Constitution.

[¶ 18] Another common feature of the cases upholding the constitutionality of such searches is the list of factors considered to determine reasonableness. In *Vernonia,* these factors were stated as: (1) "the nature of the privacy interest upon which the search here at issue intrudes," 515 U.S. at 654, 115 S.Ct. at 2391; (2) "the character of the intrusion that is complained of," *Id.* at 658, 115 S.Ct. at 2393; and (3) "the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it." *Id.* at 660, 115 S.Ct. at 2394. The same three factors, in only slightly different words, were also considered in *Earls,* 536 U.S. at 830–34, 122 S.Ct. at 2565–67; in *Joye,* 176 N.J. at 584–85, 826 A.2d at 633–34; in *Linke,* 763 N.E.2d at 979; and in *Theodore,* 575 Pa. at 341–42, 836 A.2d at 88.

■ [¶ 19] This list of factors is also consistent with Wyoming precedent. We have explained that the reasonableness of a search

is not capable of precise definition or any mechanical application. Each case requires a weighing of the need for the particular search in the public interest against the invasion of the personal rights that the search calls for. Courts must probe the scope of the particular intrusion, the manner in which it is carried on, the justifica-

tion for its initiation, and the place in which it is conducted.

*Jessee v. State,* 640 P.2d 56, 61 (Wyo.1982), *overruled on other grounds by Jones v. State,* 902 P.2d 686, 692 (Wyo.1995). Again, based on our precedent and guidance from other jurisdictions, we will determine the reasonableness of searches under the School District's Policy by weighing three factors: (1) the nature of the personal privacy rights that the Coalition claims are infringed by the Policy; (2) the scope and manner of the alleged intrusion on the students' rights; and (3) the nature of the public interest and the efficacy of the means chosen to further that interest.

■ [¶ 20] The Coalition asserts that a "child, merely on account of his minority, is not beyond the protection of the Constitution," citing as authority *ALJ,* 836 P.2d at 315 (Urbigkit, C.J., concurring in part and dissenting in part). We agree, and indeed, have previously acknowledged that students do not "shed their constitutional rights" at the schoolhouse gate. *Board of Trustees v. Spiegel,* 549 P.2d 1161, 1175 (Wyo.1976), quoting *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). In *ALJ,* however, we also recognized that what is "reasonable under all of the circumstances" is different in different circumstances.

[¶ 21] In *ALJ,* a minor was adjudicated delinquent and placed on probation. *ALJ,* 836 P.2d at 309. In his appeal, the minor claimed that the probation condition requiring him to submit to random urine testing for alcohol violated his right to be free from unreasonable searches and seizures under both the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution. He pointed out that, in *Pena v. State,* 792 P.2d 1352 (Wyo.1990), we held that "a parole officer, before he makes a search, must still have a 'reasonable suspicion' that the parolee committed a parole violation." *ALJ,* 836 P.2d at 311. Claiming the same constitutional rights, the minor in *ALJ* contended that he could not be forced to submit to random urinalysis absent

reasonable suspicion that he had used alcohol.

[¶ 22] We agreed that urinalysis is a search for constitutional purposes, and that constitutional rights apply to juveniles. We said, however, that constitutional protections against unreasonable searches and seizures may apply differently to minors than to adults. *Id.* We recognized that, pursuant to Wyoming's Juvenile Justice Act, Wyo. Stat. § 14-6-229, a judge imposing probation on a minor

> must do what is best suited for the public safety, the preservation of families, and the physical, mental, and moral welfare of the child.... To fulfill this mandate and to address the rehabilitative needs of juveniles, the court must have flexibility when it is formulating the probation conditions.

*ALJ,* 836 P.2d at 311. Based on this need for flexibility, we determined that it was "within the court's discretion to allow a probation officer to search a juvenile without reasonably suspecting that a probation violation exists." *Id.* Thus, we held that a minor probationer could be subject to random, suspicionless testing for alcohol, even though an adult probationer could not be searched without reasonable suspicion.

[¶ 23] The analysis in *ALJ* applies to the case before us now. We recognize that public school students in Wyoming are protected from unreasonable searches and seizures by Article 1, § 4 of the Wyoming Constitution, but we also acknowledge that what is reasonable under all of the circumstances must be determined in light of factors such as the age of the students and the school environment. Wyoming school districts have a "compelling interest" in providing for the safety and welfare of their students. *RM v. Washakie County School Dist. No. 1,* 2004 WY 162, ¶ 16, 102 P.3d 868, 873 (Wyo.2004). Indeed, we have expressed "little doubt that the safety and welfare of students in the state are of utmost importance." *Id.* In order to maintain safety and welfare, schools are afforded the flexibility to impose rules on students that might be inappropriate for adults. As the United States Supreme Court observed, a school's role "is custodial and tutelary, permitting a degree of

supervision and control that could not be exercised over free adults." *Vernonia,* 515 U.S. at 655, 115 S.Ct. at 2392. Because of the degree of supervision and control a school commonly exercises over its students, "students generally have diminished privacy expectations born of the government's duty to maintain safety, order, and discipline in the schools." *Joye,* 176 N.J. at 597, 826 A.2d at 642.

[¶ 24] The School District further points out that students participating in extracurricular activities are subject to rules and requirements not applicable to students in general. As set forth in the School District's Student Activity Code of Conduct: "Students who volunteer to participate in the Goshen County School District No. 1 extracurricular activities programs do so with the understanding that they must observe some regulations that are more restrictive than those relating to the general student community." These regulations vary according to the particular activity, but include requirements for medical releases and physical exams, academic standards, attendance rules, and compliance with specific rules pertaining to tobacco, alcohol, controlled substances, and offensive conduct. Because students who participate in extracurricular activities are already regulated more strictly, their reasonable expectations of privacy are even more limited than those of the general student population. *See Linke,* 763 N.E.2d at 981; *Earls,* 536 U.S. at 832, 122 S.Ct. at 2566. Accordingly, we conclude that the legitimate expectations of privacy are reduced for those students subject to drug testing under the School District's Policy.

[¶ 25] The School District's Policy specifies that students participating in extracurricular activities must consent to testing, chiefly through urinalysis, for drugs and alcohol. The Coalition correctly contends that urination is a bodily function traditionally shielded by privacy. *See Earls,* 536 U.S. at 832, 122 S.Ct. at 2566. However, the degree to which the School District's Policy intrudes on the students' privacy depends largely upon the details of how the urine samples are collected. *Id.*

[¶ 26] Under the School District's Policy, students to be tested are randomly selected by an independent testing company. Selected students are sent individually into a restroom to produce a sample. Each student enters the restroom alone, and remains unobserved while producing a sample. Direct observation of the students is not necessary, as tampering with the samples is prevented by measures such as rendering water faucets inoperable and placing dye in the water in the toilets. When a student exits the restroom, the sample is handed to a testing company employee, who splits the sample in two and marks them while the student observes. The student then returns to class.

[¶ 27] The School District's Policy is less intrusive than the one upheld by the United States Supreme Court in *Vernonia*, where male students were required to

> produce samples at a urinal along a wall. They remain fully clothed and are only observed from behind, if at all. Female students produce samples in an enclosed stall, with a female monitor standing outside listening only for sounds of tampering. These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially school children use daily. Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible.

*Vernonia*, 515 U.S. at 658, 115 S.Ct. at 2393. In contrast, under the School District's Policy, each student is alone in the restroom while producing a sample. No one watches or listens, and monitors remain not just outside of the stall, but out of the restroom entirely.

[¶ 28] We also note, briefly, that the School District's policy is less intrusive than the one accepted by the United States Supreme Court in *Earls*, where a monitor waited outside the bathroom stall and listened "for the normal sounds of urination in order to guard against tampered specimens." 536 U.S. at 832, 122 S.Ct. at 2566. In protecting students' privacy, the School District's Policy

is more like the one considered by the Indiana Supreme Court in *Linke*, where students went into "a private room and [were] allowed to close the door." 763 N.E.2d at 982. It is quite similar to the policy considered by the New Jersey Supreme Court in *Joye*, where students produced specimen samples "in closed-door restrooms without being observed directly by adult monitors." 176 N.J. at 599, 826 A.2d at 643.

[¶ 29] In the case before us now, the record includes evidence about the practices actually employed under the School District's Policy. Two students who were tested provided affidavits detailing their experiences.[3] The affiants said they felt embarrassed because monitoring personnel and the other students being tested could see them enter and exit the restroom. We do not find this to be an undue intrusion on the students' legitimate expectations of privacy, because students are commonly observed by others when entering or exiting school restrooms. The affiants also expressed discomfort at having to handle the sample bottles, and concern that they could not wash their hands because the faucets were turned off to prevent tampering with the samples. We note, however, that the students were allowed to wash their hands in another restroom before returning to class.

[¶ 30] We recognize that some individuals may be "seriously embarrassed by the need to provide a urine sample," while other individuals may find it "no more intrusive than a routine medical examination." *Earls*, 536 U.S. at 841, 122 S.Ct. at 2571 (Breyer, J., concurring). The School Board has implemented a number of measures clearly intended to reduce the intrusiveness of sampling under its Policy, and meant to preserve the students' privacy rights as much as possible under the circumstances. As we weigh this factor, we cannot conclude that the School District's Policy results in an undue intrusion into the students' privacy.

[¶ 31] There are additional measures taken under the School District's Policy to help preserve privacy. Testing is done for

---

**3.** The district court placed these affidavits under seal to protect the minor affiants. Sharing the district court's concern about protecting the identities of these students, we will discuss these affidavits only in broad terms.

only a specified list of substances: alcohol, marijuana, cocaine, amphetamines, barbiturates, methadone, opiates, benzodiazepines (metabolites of Valium), and propoxyphene (metabolites of Darvon). Other information about, for example, any prescription medications a student might be taking, or other information about a student's health, is beyond the scope of testing under the School District's Policy. The results of testing under the School District's Policy serve only limited purposes. A student who tests positive may be suspended from extracurricular activities and required to participate in counseling and treatment programs. However, positive test results have no academic consequences, and do not lead to school discipline. Records of the testing are kept separately from the students' academic records, are held in confidence, and are destroyed when the student graduates. Records of the testing are turned over to law enforcement officials only by court order.

[¶ 32] Similar factors in *Earls* led the United States Supreme Court to conclude that, "given the minimally intrusive nature of the sample collection and the limited uses to which the test results are put, we conclude that the invasion of students' privacy is not significant." *Id.* at 834, 122 S.Ct. at 2567. Similar factors also led the New Jersey Supreme Court to conclude that "the school's test policy limits the intrusion on the students' privacy interests and protects their personal dignity to the extent possible under the circumstances." *Joye,* 176 N.J. at 600, 826 A.2d at 644. We reach the same conclusion.

[¶ 33] As noted earlier, we have recognized that a school district has a "compelling interest" in providing for the safety and welfare of its students. *RM,* ¶ 16, 102 P.3d at 873. The School District's Policy requiring drug and alcohol testing for students who participate in extracurricular activities is intended to further its interest in maintaining the health and safety of its students. The facts of record indicate that the School District's Policy was prompted by survey results indicating that drug and alcohol use is relatively prevalent and widespread among students in Goshen County schools. Courts

appear unanimous in identifying drug and alcohol use by students as a serious threat to their health, safety, and welfare. "School years are the time when the physical, psychological, and addictive effects of drugs are most severe," and "of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty." *Vernonia,* 515 U.S. at 661–62, 115 S.Ct. at 2395. Based on the School District's compelling interest in providing for the health and safety of its students, and because drug and alcohol use presents a threat to students' health and safety, we agree with the Supreme Court of Indiana that "[d]eterring drug abuse by children in school is an important and legitimate concern for our schools." *Linke,* 763 N.E.2d at 983.

[¶ 34] As we turn to examine the efficacy of the means chosen by the School District to address that concern, it is important to note what it is that the School District must show. The Coalition appears to contend that the School District must prove that its Policy will achieve a specific level of success. We do not agree. Under such a stringent test, the School District would be limited to implementing only programs that have already been tried and proven. We do not think the Wyoming Constitution should preclude the School District from trying more innovative methods of deterring drug use. As the Supreme Court of Indiana observed, when the school district identified a drug problem among its students, it had "an interest in *experimenting* with methods to deter drug use." *Linke,* 763 N.E.2d at 984 (emphasis added).

[¶ 35] The proper test can be gleaned from the cases we have already discussed. The New Jersey Supreme Court explained that:

Reasonableness in this context does not require that the Board possess irrefutable proof verifying the efficacy of random drug and alcohol testing in reducing substance abuse among students. Rather, it is enough that the Board believed that its program would have some measurable effect in attaining the Board's objectives.

*Joye,* 176 N.J. at 603, 826 A.2d at 646. Similarly, the Pennsylvania Supreme Court said that the school would be required to make "some actual showing of the specific need for the policy and an explanation of its basis for believing that the policy would address that need." *Theodore,* 575 Pa. at 348, 836 A.2d at 92. In short, in the case before us, the School District was not required to prove that the policy will achieve a specific level of success. Rather, it is sufficient if the School District establishes that there is a rational connection between the Policy chosen and the problem identified.

[¶ 36] In this case, the School District has provided a factual basis to support its concerns regarding drug and alcohol usage by students in the district. As discussed previously, surveys identified relatively prevalent and widespread drug and alcohol use among students in Goshen County schools. This problem may not seem as serious as the one in *Vernonia,* where the United States Supreme Court quoted this description from the district court:

> The administration was at its wits end and ... a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion. Disciplinary actions had reached "epidemic proportions." The coincidence of an almost three-fold increase in classroom disruptions and disciplinary reports along with the staff's direct observations of students using drugs or glamorizing drug and alcohol use led the administration to the inescapable conclusion that the rebellion was being fueled by alcohol and drug abuse as well as the student[s'] misperceptions about the drug culture.

*Vernonia,* 515 U.S. at 649, 115 S.Ct. at 2389. On the other hand, the survey evidence presented by the School District provides more concrete evidence of a problem than the largely anecdotal evidence in *Earls,* which the United States Supreme Court summarized as follows:

> Teachers testified that they had seen students who appeared to be under the influence of drugs and that they had heard students speaking openly about using drugs.... A drug dog found marijuana

cigarettes near the school parking lot. Police officers once found drugs or drug paraphernalia in a car driven by a Future Farmers of America member. And the school board president reported that people in the community were calling the board to discuss the "drug situation."

*Earls,* 536 U.S. at 834–35, 122 S.Ct. at 2567.

[¶ 37] In the case before us now, the School District relies on information gathered by surveys to document drug and alcohol problems. This evidence is comparable to that in *Joye,* where survey results showed, for example, that "over thirty-three percent of Hunterdon Central's students between grades ten and twelve had used marijuana within the preceding twelve-month period," and that "thirteen percent of seniors had tried cocaine." 176 N.J. at 575–76, 826 A.2d at 628. "As for alcohol, the study indicate[d] that over forty percent of students between grades ten and twelve had 'been drunk' within the twelve-month period prior to the survey, and over eighty-five percent of all students had tried alcohol." *Id.* at 576, 826 A.2d at 628. The evidence in the case before us is also comparable to that in *Linke,* although survey results in that case were rendered more compelling by the "recent death" of a student from an overdose of drugs. *Linke,* 763 N.E.2d at 975.

[¶ 38] Thus, the evidence presented by the School District indicates a drug problem somewhere in the spectrum among *Vernonia, Linke, Joye,* and *Earls.* It is up to the School District to determine whether the problem is serious enough to require action. School districts in Wyoming have "wide discretion in the management of the district's affairs," and this Court "will not interfere with an honest exercise of discretion by public boards or officers." *Hyatt v. Big Horn School Dist. No. 4,* 636 P.2d 525, 529 (Wyo. 1981). In this case, the School District decided that there is a drug problem among its students, and it has presented evidence to support that belief. Like the United States Supreme Court, we "cannot articulate a threshold level of drug use that would suffice to justify a drug testing program for schoolchildren," and "we refuse to fashion what would in effect be a constitutional quantum of

drug use necessary to show a 'drug problem.'" *Earls,* 536 U.S. at 836, 122 S.Ct. at 2568. As in *Earls,* the "School District has provided sufficient evidence to shore up the need for its drug testing program." *Id.* at 835, 122 S.Ct. at 2568.

[¶ 39] The real difficulty in this case surrounds the efficacy of the School District's chosen means of addressing the problem it has identified. The School District has chosen to require drug and alcohol testing for all students involved in extracurricular activities. Like the dissenters in *Earls,* we are troubled that the School District's Policy targets students who may be perceived as "least likely to be at risk from illicit drugs and their damaging effects." *Earls,* 536 U.S. at 843, 122 S.Ct. at 2572 (Ginsburg, J., dissenting). To explain the nature of this concern, it is helpful to consider important differences between *Vernonia* and *Earls.*

[¶ 40] In *Vernonia,* the school district did not require testing for all students, or for all students involved in extracurricular activities. Rather, its drug testing policy applied only to students involved in interscholastic athletics. The United States Supreme Court upheld this policy, concluding that the school district had adequately identified a drug problem among its students, particularly among its student athletes, and that the policy implemented by the school district was rationally related to the problem because it was aimed directly at the student athletes who were a major part of the problem. In addition, the Court noted that the program was directed "narrowly to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Id.* at 662, 115 S.Ct. at 2395.

[¶ 41] In *Earls,* the Court upheld a drug testing policy that, like the one before us now, applied not just to student athletes, but to students involved in extracurricular activities of any kind, "such as the Academic Team, Future Farmers of America, Future Homemakers of America, band, choir, pom pon, cheerleading, and athletics." 536 U.S. at 826, 122 S.Ct. at 2562–63. As noted above, there was anecdotal evidence of drug use at the schools. There was, however, no

evidence indicating that students participating in extracurricular activities were a particular source of the drug problem, or that drug usage was any more prevalent among them than among the general student population. The Tenth Circuit Court of Appeals found this lack of evidence fatal to the policy, ruling that a school district "seeking to impose a random suspicionless drug testing policy as a condition to participation in a school activity must demonstrate that there is some identifiable drug abuse problem among a sufficient number of those subject to the testing, such that testing that group of students will actually redress its drug problem." *Earls v. Board of Education,* 242 F.3d 1264, 1278 (10th Cir.2001). The Supreme Court specifically rejected this test, however, instead ruling that, "Given the nationwide epidemic of drug use, and the evidence of increased drug use in [the] schools, it was entirely reasonable for the School District to enact this particular drug testing policy." *Earls,* 536 U.S. at 836, 122 S.Ct. at 2568.

[¶ 42] In *Earls,* those who challenged the drug policy, relying on *Vernonia,* asserted that "the testing of nonathletes does not implicate any safety concerns, and that safety is a 'crucial factor.'" *Id.* The United States Supreme Court also rejected this argument, stating that "the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and nonathletes alike." *Id.* at 836, 122 S.Ct. at 2568.

> While in *Vernonia* there might have been a closer fit between the testing of athletes and the trial court's finding that the drug problem was "fueled by the 'role model' effect of athletes' drug use," such a finding was not essential to the holding.... *Vernonia* did not require the school to test the group of students most likely to use drugs, but rather considered the constitutionality of the program in the context of the public school's custodial responsibilities. Evaluating the Policy in this context, we conclude that the drug testing of ... students who participate in extracurricular activities effectively serves the School District's in-

terest in protecting the safety and health of its students.

*Id.* at 837–38, 122 S.Ct. at 2569.

[¶ 43] These aspects of the Court's decision were particularly criticized by the dissenters, who asserted that interscholastic athletics "require close safety and health regulation; a school's choir, band, and academic team do not." *Id.* at 846, 122 S.Ct. at 2573.

> Not only did the Vernonia and Tecumseh districts confront drug problems of distinctly different magnitudes, they also chose different solutions: Vernonia limited its policy to athletes; Tecumseh indiscriminately subjected to testing all participants in competitive extracurricular activities. Urging that "the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and nonathletes alike," ... the Court cuts out an element essential to the *Vernonia* judgment....
> At the margins, of course, no policy of random drug testing is perfectly tailored to the harms it seeks to address. The School District cites the dangers faced by members of the band, who must "perform extremely precise routines with heavy equipment and instruments in close proximity to other students," and by Future Farmers of America, who "are required to individually control and restrain animals as large as 1500 pounds." ... Notwithstanding nightmarish images of ... livestock run amok, and colliding tubas disturbing the peace and quiet of Tecumseh, the great majority of students the School District seeks to test in truth are engaged in activities that are not safety sensitive to an unusual degree. There is a difference between imperfect tailoring and no tailoring at all.
> The Vernonia district, in sum, had two good reasons for testing athletes: Sports team members faced special health risks and they "were the leaders of the drug culture." ... No similar reason, and no other tenable justification, explains Tecumseh's decision to target for testing all participants in every competitive extracurricular activity.

*Id.* at 851–53, 122 S.Ct. at 2576–77 (Ginsburg, J., dissenting) (emphasis omitted).

[¶ 44] The Coalition, in the case before us now, makes similar arguments against the School District's Policy: there is no evidence that participants in all extracurricular activities are leaders of the drug culture, and there are no special health risks faced by those who participate in, for example, choir, drama club, or student council. For these reasons, the Coalition argues that there is, in effect, a disconnect between the problem identified by the School District—widespread drug and alcohol use among students—and the means chosen to address that problem— testing all students who participate in extracurricular activities. Based on this disconnect, the Coalition urges us to find the Policy unconstitutional.

[¶ 45] By a narrow margin, however, we believe that the School District has demonstrated a sufficient connection between the means chosen and the problem identified. The School District has explained that it chose to test students who participate in extracurricular activities in order to "undermine the effects of peer pressure by providing legitimate reasons for students to refuse use of illegal drugs and/or alcohol." The School District's Policy, like the policy considered in *Earls,*

> seeks to discourage demand for drugs by changing the school's environment in order to combat the single most important factor leading schoolchildren to take drugs, namely, peer pressure.... It offers the adolescent a nonthreatening reason to decline his friend's drug-use invitations, namely, that he intends to play baseball, participate in debate, join the band, or engage in any one of half a dozen useful, interesting, and important activities.

*Id.* at 840–41, 122 S.Ct. at 2570 (Breyer, J., concurring). There may be no guarantee that the Policy will achieve this purpose, but the School District has shown a rational basis for believing that it might.

[¶ 46] In addition, the Coalition alleged in its complaint that a majority of students in Goshen County schools participate in extracurricular activities, and the School District admitted this allegation. Under the School District's Policy, then, a majority of the stu-

dents in the district will be subject to drug and alcohol testing. The School District has presented survey evidence that a substantial percentage of students are at risk from drug or alcohol use. Given these facts, we cannot say it is irrational for the School District to anticipate that there is some substantial number of students who both participate in extracurricular activities and are at risk from drug or alcohol use. Because the Policy is clearly aimed at deterring drug and alcohol use among these students, we cannot conclude that the School District's Policy lacks efficacy.

[¶ 47] The Coalition fervently stresses the importance of extracurricular activities, asserting that they are "critically important" in developing "the type of responsible students who will some day be leaders in our communities and in our State." The Coalition offered evidence that involvement in extracurricular activities is particularly significant to students who wish to pursue higher education. We readily acknowledge the importance of extracurricular activities in Wyoming's public schools. But we also recognize, as did the United States Supreme Court, that participation in extracurricular activities is a voluntary choice. *Vernonia*, 515 U.S. at 657, 115 S.Ct. at 2393. *See also Joye*, 176 N.J. at 611, 826 A.2d at 651 ("[W]e cannot conclude that the importance of extracurricular activities outweighs the Board's articulated need to engage in reasonable efforts to enhance the educational environment for all students by reducing substance abuse within its high school."); *Linke*, 763 N.E.2d at 981 ("The fact that refusal to agree to drug testing results in forfeiture of the opportunity to obtain certain benefits is not so weighty as to constitute forced consent.").

[¶ 48] Because participation in extracurricular activities is optional, the School District's Policy in this case, like the one in *Earls*, "preserves an option" for a student who chooses not to be tested for drugs and alcohol. "He can refuse testing while paying a price (nonparticipation) that is serious, but less severe than expulsion from the school." *Earls*, 536 U.S. at 841, 122 S.Ct. at 2571 (Breyer, J., concurring). A student who genuinely believes that his privacy rights are

unduly infringed by the School District's Policy may choose not to submit to drug and alcohol testing. He will have to forego optional extracurricular activities, but he is not deprived of the fundamental right to an education.

[¶ 49] Finally, we note evidence that the School District did not adopt this Policy hastily or without careful consideration. Before the Policy was adopted, the Superintendent of Schools sent a letter to parents and guardians of school students. In this letter, the Superintendent summarized the survey results from the past several years as indicating "a serious prevalence of alcohol and drug use among our students." He explained previous efforts to address that problem, including educational and awareness programs, but said that "other school districts can and are doing more. Random drug testing of students involved in extra-curricular activities is an example of what other districts have successfully implemented to encourage youngsters to avoid the use of drugs and alcohol." He then invited recipients to a public forum in order to "hear from representatives from other school districts about the process of implementing a random drug and alcohol policy," and to receive "public comment on this issue."

[¶ 50] After engaging in this process to assess the Policy, the School District's board of trustees adopted the Policy by a vote of eight to one. As the Superintendent explained in his affidavit,

> The policy recognizes that many of the students participating in extracurricular activities are viewed as role models to other students and that it is important that they avoid drug and alcohol use in their position as role models. It is also the position of the Board that to achieve the goal of reducing risks of alcohol and drug abuse and to maximize the skills and talents participating in extracurricular activities, it is important that participants refrain from drug and alcohol use. *It is the belief of our school district that this policy will assist in that endeavor.*

(Emphasis added.) As we noted earlier, when we consider the efficacy of the School District's Policy, "it is enough that the Board

believed that its program would have some measurable effect in attaining the Board's objectives," *Joye,* 176 N.J. at 603, 826 A.2d at 646, and the School District must provide "an explanation of its basis for believing that the policy would address that need." *Theodore,* 575 Pa. at 348, 836 A.2d at 92. In this case, the School District has supplied a sufficient explanation of why it believes its Policy is "reasonably related to achieving the school's purpose in providing for the health and safety of students, and undermining the effects of peer pressure by providing a legitimate reason for students to refuse to use illegal drugs." *Linke,* 763 N.E.2d at 986.

[¶ 51] In sum, we acknowledge that Article 1, § 4 of the Wyoming Constitution protects public school students from unreasonable searches and seizures. In considering whether the testing mandated by the School District's Policy is reasonable under all of the circumstances, we recognized that students, particularly those who participate in extracurricular activities, are already subject to more stringent rules and regulations than adults, and so have limited expectations of privacy in the school setting. We found that the School District's Policy adequately preserves the students' personal privacy rights, and appropriately limits the degree of invasion into those rights. We concluded that the School District has a compelling interest in providing for the safety and welfare of its students, and that it therefore has a legitimate interest in deterring drug and alcohol use among students. On the closest question of all, we determined that the School District showed that its Policy requiring random, suspicionless drug and alcohol testing for all students who participate in extracurricular activities is rationally related to furthering its interest in deterring drug and alcohol use among students.

[¶ 52] We conclude that the Coalition has not demonstrated that the School District's Policy subjects students to searches that are unreasonable under all of the circumstances. Accordingly, we hold that the School District's Policy does not violate Article 1, § 4 of the Wyoming Constitution.

### Equal Protection

[¶ 53] The United States Constitution provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). "The Wyoming Constitution does not contain such an express 'equal protection' clause; rather, it contains a variety of equality provisions, *viz.,* Article 1, §§ 2, 3, and 34; and Article 3, § 27." *Greenwalt v. Ram Rest. Corp.,* 2003 WY 77, ¶ 39, 71 P.3d 717, 730 (Wyo.2003). Despite differences between the texts of the two constitutions, the Coalition concedes that "this Court uses the conventional federal equal protection analysis in the interpretation of the equality provisions of the Wyoming Constitution." *Newport International University, Inc. v. State Dept. of Educ.,* 2008 WY 72, ¶ 15, 186 P.3d 382, 387 (Wyo.2008).

[¶ 54] In determining whether there is a violation of equal protection doctrine,

> we require the party claiming such violation to first demonstrate that the classification at issue "treats similarly situated persons unequally." *Matter of ALJ,* 836 P.2d 307, 313 (Wyo.1992). If we determine that the classification does "treat similarly situated persons unequally," we apply two different levels of scrutiny depending upon the nature of the classification to determine whether equal protection is violated.
>
> > That is, where a statute ... affects a fundamental interest or creates an inherently suspect classification, the court must strictly scrutinize that statute ... to determine if it is necessary to achieve a compelling state interest. However, if the statute ... only affects ordinary interests in the economic and social welfare area, the court need only determine that it is rationally related to a legitimate state objective.

*Ellett v. State,* 883 P.2d 940, 944 (Wyo.1994), quoting *White v. State,* 784 P.2d 1313, 1315 (Wyo.1989). While the cases cited above

dealt with statutory provisions, we apply the same analysis to the School District's Policy.

[¶ 55] The Coalition claims that the School District's Policy divides similarly situated students into two classifications: those who participate in extracurricular activities, and those who do not. It claims that the Policy treats the two classes unequally: those who participate in extracurricular activities are subject to random, suspicionless testing for drugs and alcohol, while those who do not participate in extracurricular activities are not subject to such testing. In contrast, the School District argues that the Policy does not create two separate but similarly situated classes that are treated differently. According to the School District, every student who attends school in Goshen County has an equal opportunity to receive an education. Every student has the same rights, including the right to choose whether or not to participate in extracurricular activities. Further, the School District contends, "[t]o the extent a student chooses to participate in activities, each and every student is similarly treated in that all students are equally required to comply with the rules and regulations" adopted by the School District, including the Policy requiring drug and alcohol testing.

[¶ 56] Even if we assume, without deciding, that the Coalition has accurately identified a classification through which similarly situated persons are treated unequally, the argument presented by the Coalition is unpersuasive. The Coalition contends that the School District's Policy must be subject to strict scrutiny. However, it does not claim that students are a suspect class, nor does it assert that students have a fundamental interest in participating in extracurricular activities. Rather, the Coalition urges us to apply strict scrutiny because "the 'fundamental right' at issue in this case is the right to be free from an unreasonable search undertaken in violation of Article 1, § 4 of the Wyoming Constitution." This contention fails because, as already established, the School District's Policy does not subject students to unreasonable searches. We therefore reject the Coalition's position that we should subject the School District's Policy to

strict scrutiny under our equal protection analysis.

[¶ 57] If we ask instead whether the School District's Policy is rationally related to a legitimate state objective, we find that question already resolved by our previous analysis. In determining that the drug and alcohol testing required under the Policy was reasonable under all of the circumstances, we concluded that the School District has a compelling interest in providing for the safety and welfare of its students, and a legitimate interest in deterring drug and alcohol use among students. We also concluded that the School District's Policy is reasonably related to furthering those interests. With these conclusions, we also effectively determined that the School District's Policy is rationally related to a legitimate state objective.

[¶ 58] The equal protection argument, as presented by the Coalition, can succeed only if the Coalition also succeeds on its search and seizure claim. Our conclusion that the School District's Policy does not subject students to unreasonable searches and seizures is, therefore, determinative of the Coalition's equal protection claim as well.

### Due Process

[¶ 59] Article 1, § 6 of the Wyoming Constitution provides that "No person shall be deprived of life, liberty or property without due process of law." The Fifth Amendment to the United States Constitution contains similar language, which applies to the states pursuant to the Fourteenth Amendment. We have explained that a "party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness." *DH v. Wyoming Department of Family Services*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo.2003) (internal citations omitted).

[¶ 60] The Coalition points out that, under the School District's Policy, a student found to be in violation of the Policy may appeal that decision to the Superintendent or his designee. Under the terms of the Policy, the Superintendent's decision on a student's

appeal is "conclusive in all respects." The Coalition contends that this provision violates the due process protections of the state and federal constitutions "by foreclosing any type of review, judicial or otherwise, of the Superintendent's final decision regarding whether a student is in violation of the Drug Testing Policy."

[¶ 61] The School District maintains the due process provisions of the state and federal constitutions apply only if the Coalition shows that it has been deprived of a protected life, liberty, or property interest. Characterizing a student's participation in extracurricular activities a privilege rather than a protected right, the School District contends that the Coalition has not shown that any student's due process rights are infringed by the Policy. The district court adopted the School District's position, ruling that participation in extracurricular activities

is not a protected interest. *See, e.g., In re University Interscholastic League,* 20 S.W.3d 690, 692 (Tex.2000) (right to participate in extracurricular activities is not a fundamental right); *Mancuso v. Massachusetts Interscholastic Athletic Ass'n, Inc.,* 453 Mass. 116, 900 N.E.2d 518, 527–28 (2009) (for due process purposes, student's property interest in her right to public education did not imply that she also had a property interest in her participation in extracurricular activities); *Adamek v. Pennsylvania Interscholastic Athletic Ass'n, Inc.,* 57 Pa.Cmwlth. 261, 426 A.2d 1206 (1981) (collecting cases that found participation in extracurricular activities was not a fundamental property right).

Though the Wyoming Supreme Court has never addressed the issue, the Court finds these and the myriad of concurring cases persuasive because Wyoming requires compulsory school attendance. Wyo. Stat. Ann. §§ 21–4–101–107 (LexisNexis 2009). The Wyoming Legislature has also set forth a right for students age 5 to 21 to attend public school. Wyo. Stat. Ann. § 21–4–301 (LexisNexis 2009). However, there are no legislative counterparts mandating students' participation in extracurricular activities or creating a statutory right to such participation.

This Court finds that the Goshen County students do not hold a property interest in their participation in extracurricular activities.... Without such a protected interest, they have no right to the protection of due process as provided by the U.S. and Wyoming Constitutions. *See Regents of State Colleges v. Roth,* 408 U.S. 564, 569 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972).

[¶ 62] We do not need to agree or disagree with the district court's conclusion, because we find a more fundamental flaw in the Coalition's due process claim. As stated above, a party claiming an infringement of his due process rights must demonstrate both a protected interest and an impermissible infringement on that interest. *DH,* ¶ 38, 79 P.3d at 1008. The Coalition has not demonstrated any infringement because it has not shown, or even alleged, that any of its members has sought and been denied judicial review of any decision made by the Superintendent pursuant to the Policy. The Coalition's speculation that judicial review might be denied in the future is insufficient to support a due process claim now. "Constitutional questions are too important to be answered by this court at random and should not be answered unless fully presented." *Meyer v. Norman,* 780 P.2d 283, 289 (Wyo. 1989), quoting *Witzenburger v. State, ex rel. Wyoming Community Development Authority,* 575 P.2d 1100, 1134 (Wyo.1978) and *Tharp v. Unemployment Compensation Comm'n,* 57 Wyo. 486, 502, 121 P.2d 172, 178 (1942). Until this Court is presented with a case in which judicial review has been denied, it is premature to consider the Coalition's claim that the Policy violates due process. The district court did not err in granting summary judgment against the Coalition on this claim.

### Remaining Issues

[¶ 63] Because the Coalition has failed to prove that the School District's Policy is unconstitutional, there is no basis for their claim that they are entitled to a permanent injunction against implementation of the Policy, or for their claim that the district court erred in granting the School District's motion

for summary judgment. In conclusion, we find ourselves in agreement with the observation of Justice Breyer of the United States Supreme Court: "I cannot know whether the school's drug testing program will work. But, in my view, the Constitution does not prohibit the effort." *Earls,* 536 U.S. at 842, 122 S.Ct. at 2571. We therefore affirm the grant of summary judgment in the School District's favor.